IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel*. KRISTA NICHOLSON, | ) ) ) | |
| Plaintiff, | ) ) | **JURY DEMAND** |
| v. | ) ) | Case No. 3:20-cv-309 |
| CLARKSVILLE PAIN INSTITUTE, LLC;<br>PAIN INSTITUTE OF NASHVILLE, PLC;<br>MICHAEL COX; and DEBBIE COX, | ) ) ) ) ) | |
| Defendants. | ) | |

**<u>UNITED STATES' AMENDED COMPLAINT-IN-INTERVENTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 4

JURISDICTION AND VENUE ...................................................................................... 6

THE PARTIES.................................................................................................................. 6

THE APPLICABLE STATUTES.................................................................................... 9

    A.    The Federal False Claims Act ............................................................... 9
    B.    The Relevant Government Health Benefit Programs ........................................ 10
        Medicare Part B Program ........................................................................ 10
        VA Health Benefits Programs ................................................................. 16
        FHBP's Reliance ...................................................................................... 18
        Requirements for Laboratory Testing ..................................................... 18
        Urine Drug Tests ...................................................................................... 20
        Psychological and Neuropsychological Testing ..................................... 26
        Allergy Testing......................................................................................... 27

THE FRAUDULENT SCHEMES.................................................................................. 28

    A.    The Pain Institute's Formation ........................................................... 28
    B.    Defendants' Profit Motive & Business Practices ........................................ 30
    C.    The Urine Drug Testing Scheme .......................................................... 34
        1. The Clinic's UDT Operation ............................................................. 34
        2. The Coxes Supervised the UDT Operations...................................... 37
        3. UDT Summary ................................................................................... 51
    D.    The Allergy Testing Scheme ................................................................ 52
    E.    The Psychological Testing Scheme...................................................... 58
    F.    The Coxes and the Defendant Entities Required Patients to Submit to Testing and Pressured Providers to Carry Out the Testing Schemes ..................................................... 63
    G.    The Pain Institute's Billing Trends...................................................... 66
        1. General Statistics on the Pain Institute's UDT Practices....................... 66
        2. Statistics on the Pain Institute's Psychological Testing.......................... 70
    H.    A Review of a Random Sample of Medical Records Showed the Testing Was Not Medically Necessary ...................................................................... 70
        1.  UDT ................................................................................................. 70
        2.  Allergy Testing ............................................................................... 72
        3.  Psychological Testing ..................................................................... 73
        4.  Random Sample & Medical Review Summary ..................................... 73
    I.    CMS Issued a Medicare Payment Suspension to the Pain Institute................................. 74
    J.    The Coxes and the Defendant Entities Received Numerous Warnings in Audits and Letters from Insurers that the Pain Institute's Testing Was Not Medically Necessary or Reimbursable ........................................................................ 75
    K.    Representative Examples of False Claims.................................................. 86
        A.    Beneficiary A – UDT ..................................................................... 87
        B.    Beneficiary B – UDT and Psychological Testing ................................. 89
        C.    Beneficiary C – Allergy Testing ................................................... 91

2

D. Beneficiary D – UDT ................................................................................. 92

E. Beneficiary E – UDT................................................................................. 93

F. Beneficiary F – UDT and Psychological Testing..................................... 95

G. Beneficiary G – UDT ................................................................................ 98

First Claim for Relief (Violations of FCA – Presentation of False Claims)................................ 99

Second Claim For Relief (Violations of FCA – False Statements) ........................................... 100

Third Claim for Relief (Payment by Mistake).............................................................................. 101

Fourth Claim for Relief (Unjust Enrichment)............................................................................... 102

Prayer for Relief............................................................................................................................. 102

Jury Demand ................................................................................................................................... 102

The United States of America brings this action under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and common law theories of payment by mistake and unjust enrichment against Defendants Clarksville Pain Institute, LLC, Pain Institute of Nashville, PLC, Michael Cox, and Debbie Cox (collectively, "Pain Institute," or "the Coxes") and alleges as follows:

**INTRODUCTION**

1. This case is about a pain management clinic that engaged in millions of dollars of medically unnecessary testing. The owners of the clinic, Michael and Debbie Cox, knew that the testing was duplicative, wasteful, and lacked clinical utility. They were warned many times over the years that their clinic's level of testing was medically unnecessary and that their practice was a statistical outlier for certain kinds of tests. They carried on with the unnecessary testing because it made them more money. The medically unnecessary testing was carried out by various related defendant corporate entities (all owned and directly managed by Michael and Debbie Cox) to bill the United States for false and/or fraudulent claims administered to beneficiaries of Medicare and the Veterans Administration (collectively, "the Federal Health Benefit Programs" or "FHBP"). The Coxes exercised complete control over these entities to devise and execute different schemes to illegally profit from medically unnecessary testing for patients.

2. Across the files of different patients with different medical needs, as different providers and employees came and went, and as time passed, the Coxes' clinic continued to do the same (very high) level of testing, especially urine drug testing. That is because the Coxes were still there directing it.

3. Specifically, the Pain Institute and the Coxes billed FHBP for three kinds of tests that were not medically necessary: urine drug testing ("UDT"), allergy testing, and psychological testing. The Coxes influenced and pressured mid-level providers and other personnel to routinely

4

place orders for tests patients did not need. By pressuring providers and staff at their clinic and onsite laboratory, the Coxes contrived different schemes to over-test patients for care those patients did not need.

4. The Pain Institute and the Coxes billed FHBP for UDT, allergy testing, and psychological testing that were not rendered, not medically necessary, not used in the treatment of FHBP beneficiaries, billed pursuant to impermissible blanket orders, and/or not ordered by the treating practitioner. These services did not comply with material requirements of FHBP laws, regulations, and program instructions, and as the Pain Institute and the Coxes knew, were not reimbursable.

5. The Coxes and the Defendant entities knew or should have known that the tests were not medically necessary, yet they still submitted or caused the submission of claims to FHBP for these tests. The Pain Institute and the Coxes knew, acted in deliberate ignorance, or acted in reckless disregard of FHBP requirements, including that all billed services be performed as billed and medically reasonable and necessary for the treatment of an individual beneficiary. The Pain Institute and the Coxes submitted claims to FHBP for payment anyway thereby presenting false claims and making materially false express and implied certifications to get such claims paid. The Pain Institute and the Coxes were informed many times between 2017 and 2024 that their practices for these kinds of tests were not consistent with FHBP laws, regulations, and program instructions. Still, they recklessly ignored the warnings and continued billing for unnecessary medical testing.

6. Through these and other practices, from at least April 2014 through May 2024, the Pain Institute and the Coxes knowingly submitted and caused to be submitted millions of dollars in false claims to FHBP for services that were not reasonable and necessary for treatment of their

5

patients. The United States suffered millions of dollars in damages when Medicare and VA paid for such false or fraudulent claims.

7. The United States brings this action pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), and federal common law to recover damages, as well as applicable civil penalties and treble damages.

## JURISDICTION AND VENUE

8. On April 10, 2020, Relator Krista Nicholson initiated this action pursuant to the *qui tam* provisions of the False Claims Act. 31 U.S.C. § 3730(b).

9. On July 12, 2024, the United States filed its notice of election to intervene. D.E. 60.

10. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732 and 28 U.S.C. §§ 1331 and 1345.

11. This Court also has supplemental jurisdiction over all common law or equitable claims under 28 U.S.C. § 1367(a).

12. This Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and 1391(c), because Defendants reside in and transact business in this District, and the conduct that gave rise to this case occurred in this District.

## THE PARTIES

13. Plaintiff United States brings this action on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), which administers the Medicare program, and the United States Department of Veterans Affairs and the Veterans Health Agency.

14. Clarksville Pain Institute, LLC ("CPI") was a single-member limited liability company formed in 2012 with its principal place of business at 1849 Madison Street, Suite F, Clarksville, TN 37043. At all times relevant to this complaint, CPI's principal place of business was Clarksville, Tennessee. Clarksville Pain Institute, LLC had three assumed names: Whitehouse Pain Institute, Nashville Pain Institute, and Cox Family Pharmacy. Clarksville Pain Institute, LLC's registered agent was Michael Cox. Debbie Cox was the sole member of Clarksville Pain Institute, LLC.

15. Pain Institute of Nashville, PLC ("PIN") is a professional limited liability company formed in 2017 with its principal place of business at 1849 Madison Street, Suite F, Clarksville, TN 37043. At all times relevant to this complaint, PIN's principal place of business was Clarksville, Tennessee. PIN has two assumed names: Pain Institute of Springfield/Whitehouse, and Pain Institute of Clarksville. Pain Institute of Nashville, PLC's registered agent and secretary is Michael Cox. When PIN was formed on February 15, 2017, Debbie Cox held a 99% membership interest, and John Stanton held a 1% membership interest. John Stanton withdrew his membership interest on February 15, 2022. On August 31, 2022, John Stanton was convicted of violating 21 U.S.C. § 846 in Case No. 6:21-cr-19-REW-HAI-4 in the Eastern District of Kentucky.

16. CPI and PIN merged on November 1, 2018, with PIN as the surviving entity.

17. At one time, Meghan Anderson, NP, was a member of PIN, but she transferred her interest to DFCAPRN, PLC, an entity of which Debbie Cox is the sole member, on August 7, 2023.

18. At all times relevant to this Complaint, CPI and PIN were both controlled and managed directly by Debbie and Michael Cox for the same pain clinic business.

7

19. Pain Institute of Nashville, PLC and Clarksville Pain Institute, LLC, had the same staff, operated at the same location, offered the same services, and had the same management.

20. Michael Warren Cox is a former healthcare industry sales representative who resides at 1224 Waterstone Boulevard, Franklin, TN 37069.

21. Debbie Ferguson Cox is a licensed nurse anesthetist with Tennessee nursing license numbers 11765 (advance practice registered nurse) and 137175 (registered nurse). She resides at 1224 Waterstone Boulevard, Franklin, TN 37069.

22. Debbie and Michael Cox are a married couple.

23. At all times relevant to this Complaint, CPI and its corporate successor and alter ego, PIN, were owned and operated by Michael and Debbie Cox. Collectively, this Complaint refers to those entities as the "Pain Institute."

24. At all times relevant to this Complaint, the Pain Institute has operated a medical clinic located at 1849 Madison Street, Clarksville, TN 37043.

25. The Pain Institute is the medical clinic through which the Coxes implemented their fraudulent schemes on FHBP.

26. The practitioners at the Pain Institute provide pain management treatment that often involves the prescribing of opiates and other controlled substances to chronic pain patients. Defendants purported to use various medical tests to monitor and treat their patients.

27. At all times relevant to this Complaint, Michael and Debbie Cox directed and controlled the Pain Institute's daily operations, including the operation of an in-house UDT laboratory and the submission of claims for payment to FHBP.

28. Michael and Debbie Cox directly managed the business together. They both exercised control over the operations of the clinic and the laboratory.

8

**THE APPLICABLE STATUTES**

**A. The Federal False Claims Act**

29.     The FCA provides, in pertinent part, that a person who:

 (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

 (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains . . . .

31 U.S.C. § 3729(a)(1), plus a mandatory civil penalty of not less than $13,946 and not more

than $27,894 per violation. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5.[1]  For purposes of the FCA,

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—
 (i)      has     actual     knowledge     of     the     information;
 (ii)      acts in deliberate ignorance of the truth or falsity of the information; or
 (iii)      acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

30.      The FCA defines "material" to mean "having a natural tendency to influence, or

be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

---

[1] The amount of the civil penalties has increased during the relevant time period of this case. *See, e.g.*, 28 C.F.R. § 85.5; 89 Fed. Reg. 9764-01, 2024 WL 519531 (Feb. 12, 2024) (updates to civil penalty ceilings); 85 Fed. Reg. 37004-01, 2020 WL 3298441 (June 19, 2020).

## B. The Relevant Government Health Benefit Programs

31. **<u>Medicare</u>**. In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program. Medicare is a federal health insurance program that provides coverage for individuals based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1. Medicare is funded by premium payments by enrollees together with contributions from funds appropriated by the Federal Government.

32. Medicare consists of four distinct parts: A, B, C, and D. 42 U.S.C. §§ 1395c-1395i.

33. **<u>Medicare Part B Program</u>**. Defendants submitted claims under Medicare Part B, which covers certain medical services, such as laboratory test services, furnished by physicians and other suppliers and providers.[2] 42 U.S.C. § 1395k(a)(2)(B).

34. CMS administers the Medicare program. CMS contracts with private contractors, referred to Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by healthcare providers. 42 U.S.C. §§ 1395u, 1395kk-1; 42 C.F.R. Part 421. MACs generally act on behalf of CMS within a specified jurisdiction to process and pay Medicare claims submitted by health care provider.

35. At all times relevant to this Complaint, Palmetto GBA, LLC, ("Palmetto") and its predecessor, Cahaba Government Benefit Administrators, LLC ("Cahaba"), were the MACs for the services billed to Medicare by Defendants.

36. MACs also issue Local Coverage Determinations ("LCDs") which provide guidance for the states within their jurisdiction on procedures and services that are reasonable and

---

[2] In the relevant regulations, physicians and other practitioners are generally referred to as "suppliers" in the Medicare program, rather than "providers." *See* 42 C.F.R. § 400.202. This Complaint nonetheless uses the common term "provider" to refer to individual practitioners.

necessary and therefore eligible for payment under Medicare. 42 U.S.C. § 1395ff(f)(2); *see also id.* § 1395m-1(g).

37. To participate in the Medicare program as a new enrollee, providers must submit a Medicare Enrollment Application, CMS Form-855B. Enrolled providers must complete a new Form CMS-855B to change their enrollment information or to reactivate, revalidate, and/or terminate Medicare enrollment.

38. Medicare requires providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare laws, regulations, and program instructions. 42 C.F.R. § 424.516(a)(1).

39. Section 1862 of the Social Security Act, codified at 42 U.S.C. § 1395y(a)(1)(A), provides that under Medicare, "no payment may be made under part A or part B for any expenses incurred for items or services… [that] are not reasonable and necessary for the prevention of illness." When a provider submits a claim for payment to FHBP, they certify that the services both were provided as billed and are medically reasonable and necessary.

40. Similarly, under 42 C.F.R. § 411.15(k)(1) of the Medicare program regulations, any services that are not "reasonable and necessary…[f]or the diagnosis or treatment of illness or injury" are excluded from coverage.

41. To determine whether services are reasonable and necessary such that reimbursement is appropriate, Medicare requires complete documentation of services rendered to beneficiaries. *See* 42 U.S.C. §§ 1395l(e), 1395u(c)(2)(B)(i). A provider's claim for a diagnostic test is not medically reasonable and necessary if there is not sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary. *See* 42 C.F.R. § 410.32(d)(3).

11

42. To be a reimbursable service under Medicare, all diagnostic testing, "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." 42 C.F.R. § 410.32(a); Medicare Benefit Policy Manual, Ch. 15, § 80.1. Medicare will not reimburse a provider for services that do not meet these requirements.

43. The Secretary of HHS ("Secretary") is responsible for specifying services covered under the "reasonable and necessary" standard and has wide discretion in selecting the means for doing so. *See* 42 U.S.C. § 1395ff(a). The Secretary fulfills this responsibility both through formal rulemaking and through other forms of guidance.

44. HHS provides guidance to eligible providers pursuant to a series of Manuals, published by CMS, which are available to the public, including on the Internet. *See generally*, CMS Manuals, *available at* https://www.cms.gov/medicare/regulations-guidance/manuals (last visited April 14, 2025) (hereinafter "CMS Manuals").

45. A provider's authorized official must sign the "Certification Statement" in Section 15 of Form CMS-855B, which "legally and financially binds [the] supplier to the laws, regulations, and program instructions of the Medicare program."

46. Debbie Cox signed the certification statement in Section 15 of Form CMS-855B in 2014, 2015, 2016, and 2018 as the authorized official on behalf of CPI. Each time, Debbie Cox agreed:

    A. to abide by the applicable Medicare laws, regulations, and program instructions;

    B. the Medicare laws, regulations, and program instructions are available through the

12

Medicare contractor; and

C. payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with Medicare laws, regulations, and program instructions…and on the supplier's compliance with all applicable conditions of participation in Medicare.

47. Michael Cox signed the certification statement in Section 15 of Form CMS-855B in 2014 as both the "delegated official" and "office manager" on behalf of CPI. Each time he signed, Michael Cox agreed:

A. to abide by the applicable Medicare laws, regulations, and program instructions;

B. the Medicare laws, regulations, and program instructions are available through the Medicare contractor; and

C. payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with Medicare laws, regulations, and program instructions…and on the supplier's compliance with all applicable conditions of participation in Medicare.

48. Debbie Cox signed the certification statement in Section 15 of Form CMS-855B in 2017, 2021, 2022 as the authorized official on behalf of PIN. Each time, Debbie Cox agreed:

A. to abide by the applicable Medicare laws, regulations, and program instructions;

B. the Medicare laws, regulations, and program instructions are available through the Medicare contractor; and

C. payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with Medicare laws, regulations, and program instructions…and on the supplier's compliance with all applicable conditions of participation in Medicare.

49. Debbie Cox also signed the certification statement in Section 15 of Form CMS-855B in her personal capacity as a practitioner in 2017.

50. To obtain Medicare reimbursement for administered medical services, including urine drug tests, allergy tests, and psychological tests, providers submit a claim form known as the CMS 1500 form or its electronic equivalent known as the 837P format.

13

51.     To submit electronic claims via the 837P format, a provider must complete and submit to CMS an Electronic Data Interchange Enrollment Form ("EDI"). The EDI may be completed by the provider or an authorized individual who has the legal authority "to commit the provider to abide by the laws, regulations, and the program instructions of Medicare." On the EDI, the provider agrees to "submit claims that are accurate, complete, and truthful" and certifies that the use of the provider's NPI on a claim "constitutes the provider's legal electronic signature and an assurance that services were performed as billed." The provider's EDI certification then serves as the signature for every electronic claim submitted by the provider thereafter.

52.     CPI submitted one of its EDIs to Cahaba Government Benefit Administrators, LLC, the MAC prior to Palmetto, signed by Debbie Cox by facsimile dated April 25, 2013.

53.     PIN submitted one of its EDIs to Palmetto by facsimile dated January 28, 2021, signed by Debbie Cox.

54.     Among the information the provider includes on a CMS 1500 or the 837P electronic claim are Current Procedural Terminology Codes ("CPT codes"), CMS Healthcare Common Procedure Coding System ("HCPCS") codes, and/or modifiers to such codes. These codes are the providers' express identification of the services rendered and certification that such services are reimbursable.

55.     Providing accurate CPT and HCPCS codes in claims is material to and a condition of payment for FHBP. *See*, *e.g.*, Medicare Learning Network Fact Sheet, Medicare Billing: 837P and Form CMS-1500.

56.     Medicare regulations further explain, because "[t]he physician has a major role in determining utilization of health services furnished by providers," such as deciding on treatments and ordering tests, "sections 1814(a)(2) and 1835(a)(2) of the [Social Security] Act establish as a

14

condition for Medicare payment that a physician certify the necessity of the services…." 42 C.F.R. § 424.10(a). *See also* 42 C.F.R. § 424.24(g)(1).

57.     For example, when submitting the CMS 1500 to Medicare, providers certify:

A.  the claim is truthful, accurate, and complete;

B.  the provider familiarized themselves with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor;

C.  the claim complies with all applicable Medicare laws, regulations, and program instructions for payment; and

D.  the services on the claim form were medically necessary.

58.     The provider also must include on the CMS 1500 form or 837P format a National Provider Identifier ("NPI"), which is a unique 10-digit identification number corresponding to a specific healthcare provider. Claims for diagnostic laboratory services must include the NPI for the "billing provider or group", "rendering provider," and "ordering/referring provider." Medicare Claims Processing Manual, Ch. 26, § 10.4.

59.     The claims submitted to FHBP at issue in this action identified CPI (NPI 1669749537) or PIN (NPI 1073049102) as the billing provider (among other NPIs), and various mid-levels and other physicians as the rendering provider.

60.     The claims at issue here were submitted for payment by CPI or PIN to Palmetto or Cahaba, the MACs responsible for processing such claims in the State of Tennessee.

61.     Generally, after a provider electronically submits the claim to Palmetto, the claim is paid directly to the provider without any review of supporting documents, including medical records.

62.     During the time period relevant to this Complaint, Defendants submitted claims for payment to Medicare via Palmetto and/or Cahaba, Palmetto's predecessor.

15

63. Defendants billed Medicare under Part B for medical services including, but not limited to, clinical laboratory services furnished by physicians and other providers, by submitting claims for reimbursement to Palmetto. Defendants received payment from Medicare as a direct result of these submissions.

64. A provider has a duty to familiarize itself with the statutes, regulations, and guidelines regarding coverage and reimbursement for the Medicare services it provides. *See Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984).

65. **<u>VA Health Benefits Programs</u>**. The United States Department of Veterans Affairs, Veterans Health Agency, (collectively, the "VA"), offers various medical benefits programs for among others, honorably discharged veterans; those who sustained service-connected disabilities; and spouses, surviving spouses, dependent children, and family caregivers of Veterans or servicemembers. 38 U.S.C. §§ 1710, *et seq*.

66. Current and surviving spouses or children of a Veteran with disabilities or a service member who died in the line of duty who otherwise do not qualify for TRICARE are potentially eligible for health care benefit coverage through Civilian Health and Medical Program of the VA ("CHAMPVA"). 38 U.S.C. § 1781(a).

67. CHAMPVA provides medical care in the same or a similar manner as medical care furnished under TRICARE. 38 C.F.R. § 17.270.

68. CHAMPVA, as with Medicare and TRICARE, provides coverage of allowable expenses only for "medical services and supplies that are medically necessary and appropriate for the treatment of a condition and that are not specifically excluded from program coverage." 38 CFR § 17.272(a).

16

69. CHAMPVA is generally the secondary payer to all other government health care payer programs except when the beneficiary has an entitlement to state Medicaid programs and State Victims of Crime Compensation Programs. 38 C.F.R. § 17.272(a)(3)(i-iv).

70. A provider who submits claims to CHAMPVA for reimbursement may submit them electronically or on a nationally recognized standardized paper (such as CMS-1500 or UB-04) or electronic format. Such claims must be submitted no later than year after the date of service; or in the case of inpatient care, one year after the date of discharge; in the cases of retroactive approval for services/supplies and retroactive approval of beneficiary eligibility, 180 days following the notification of authorization. 38 C.F.R. § 17.275.

71. CHAMPVA regulations caution that "[c]overed benefits may have limitations. The fact that a physician may prescribe, order, recommend, or approve a service or supply does not, of itself, make it medically necessary or make the charge an allowable expense, even though it is not listed specifically as an exclusion." 38 C.F.R. § 17.272(a).

72. VA also provided Veterans health care through a program called "Fee Basis," which provided payment authorization for eligible Veterans to obtain routine medical treatment services through non-VA health care providers. 38 U.S.C. § 1703; 38 C.F.R. §§ 17.52-17.56. When VA facilities could not provide all of the necessary medical care and services required by its patients due to geographic inaccessibility, medical urgency, or when it was economically advantageous to obtain care through the community, VA was authorized to pay for medical care in private sector facilities. Civil hospitals, community nursing homes, and outpatient providers would submit bills for service to the authorizing VA facility. The VA facility would review the bills and transmit payment messages to the VA's Central Fee payment center at the Austin Information Technology Center ("AITC").

17

73. This system for sending Veterans to community care continued until June 6, 2019 when the Veterans Community Care Program began.

74. VA also provided Veterans health care through a program called Veterans Choice from 2014 through 2019.

75. **FHBP's Reliance**. Because it is not feasible for FHBP personnel to review every patient's medical record for the millions of claims for payment they receive from providers, the programs rely on providers to comply with program requirements and trust providers to submit truthful, accurate, and complete certifications and claims.

76. Generally, after a provider submits the claim to FHBP, the claim is paid directly to the provider without any review of supporting documents, including medical records.

77. FHBP, including Medicare and the VA, routinely deny payment to providers who bill for codes where the criterion for those codes is not actually met, including when the services are not medically necessary.

78. **Requirements for Laboratory Testing**. Laboratories, including those that perform diagnostic laboratory tests, must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), 42 U.S.C. § 263a, *as set forth at* 42 C.F.R. Part 493.

79. Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

80. According to CMS's Medicare Benefit Policy Manual ("MBPM") "Requirements

18

for Ordering and Following Orders for Diagnostic Tests, . . . the physician must clearly document, in the medical record his or her intent that the test be performed." MPBM, Ch. 15, § 80.6.1 (issued Aug. 29, 2008).

81.     Medicare requires proper and complete documentation of the services rendered to beneficiaries:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e).

82.     Medicare regulations expressly state that a laboratory's claim for a service will be denied if there is insufficient documentation in the patient's medical record to establish that the service was reasonable and necessary. 42 C.F.R. § 410.32(d)(3)(ii).

83.     The Department of Health and Human Services, Office of Inspector General ("HHS-OIG") also published *Compliance Program Guidance for Clinical Laboratories* in the Federal Register. 63 Fed. Reg. 45076 (Aug. 24, 1998), *available at* https://www.oig.hhs.gov/authorities/docs/cpglab.pdf (last visited April 14, 2025). Among other things, the HHS-OIG clinical laboratory guidance recommends that providers conduct and document a patient-specific assessment of necessity for each test ordered: "Medicare will only pay for tests that meet the Medicare coverage criteria and are reasonable and necessary to treat or diagnose an individual patient. . . . Medicare may deny payment for a test . . . which does not meet the Medicare coverage criteria (e.g., done for screening purposes) or where documentation in the entire patient record . . . does not support that the tests were reasonable or necessary for a given patient." *Id.* at 45079.

19

84. The Medicare Claims Processing Manual similarly instructs that "[laboratory t]ests that are performed in the absence of signs, symptoms, complaints, personal history of disease, or injury are not covered except when there is a statutory provision that explicitly covers tests for screening as described." *See* Medicare Claims Processing Manual, Ch. 16, § 120.1, *available at* https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/clm104c16.pdf (last visited April 14, 2025).

85. Drug testing is used to determine the presence or absence of drugs or metabolites in a patient's system. Different testing methodologies have different capabilities, limitations, and costs.

86. **Urine Drug Tests**. UDT is a laboratory test conducted to determine whether a patient is taking drugs that might interfere with planned medical treatment, or to ensure that a patient is compliant with his or her prescription regime. UDT is frequently administered in connection with patients undergoing pain management therapy.

87. Urine is a preferred medium for drug testing and is the medium for testing used by Defendants.

88. UDT is used to determine the presence or absence of drugs or metabolites, *i.e.*, a byproduct of a drug after it is metabolized by the body.

89. UDT is performed in a number of contexts. In the clinical pain management context—particularly in the case of management through long-term opioid use—drug testing is often used to monitor whether patients are taking prescribed drugs and adhering to treatment. The tests are used both to confirm that patients are taking, rather than diverting, the drugs that are prescribed to them, and that they are not taking other drugs not prescribed by the treating physician.

90. When appropriately used and managed by providers, UDT is recognized as an

20

appropriate medical treatment and is often reimbursed by public and private insurers. Because much of the cost associated with UDT comes from the capital investment necessary for sophisticated equipment necessary to conduct the tests, the marginal cost of performing individual tests is relatively low. Thus, the more UDT a laboratory performs, the more money it makes.

91. Two types of UDT are relevant in this case.

92. Presumptive (also known as qualitative, or point of care ("POC")) drug testing typically expresses results as a negative or positive and is used when medically necessary to determine the presence or absence of drugs or drug classes in a urine sample. Presumptive UDT methods range from point-of-care dipstick tests to tests performed by instrumented chemistry analyzers and mass spectrometry, with reimbursement rates typically increasing with the complexity of the test.

93. Definitive (also known as quantitative or confirmatory) drug tests report the results in concentrations and are medically necessary to identify specific medications, illicit substances, and metabolites. Definitive UDT is typically reimbursed at higher rates than presumptive testing.

94. Presumptive UDT performed via an immunoassay is a biochemical test that measures the presence above a cutoff level of a substance (drug) with the use of an antibody. Immunoassay results primarily detect drug classes and a few specific drugs. In some configurations, immunoassay testing can provide immediate results for the immediate management of the patient.

95. In general, immunoassay presumptive UDT is less precise and reliable than definitive UDT. For example, such testing may not distinguish between different types of opiates, may not detect all drugs or drug classes, and/or may require a concentration level "cut off" that is too high to detect the presence of a certain drug.

21

96. Because of the specific limitations of presumptive immunoassays performed on a chemistry analyzer, subsequent targeted definitive testing may, in some situations, be reasonable and necessary to ensure the treating practitioner has complete and accurate information to manage the patient's care.

97. The medical necessity of definitive UDT depends on the unique presentation and condition of each patient, each patient's drug abuse history, and/or whether the results of a preceding presumptive test, if rendered, are expected or unexpected.

98. For example, if the presumptive test provides the clinician with sufficient information for the treatment and diagnosis of a patient, a definitive test is not reasonable and necessary and not covered by FHBP.

99. For a presumptive test to be medically reasonable and necessary, it should be performed and the results considered first, and only *inconsistent* or *unexpected* results should be referred for subsequent definitive testing.

100. The technological limitations on immunoassay UDT, however, do not apply to UDT performed using High Performance Liquid Chromatography coupled with Mass Spectrometry ("LC-MS"). LC-MS is a complex technology that uses the separation capabilities of liquid chromatography with the analytical capabilities of mass spectrometry. LC-MS technology allows providers to test urine specimens for numerous drugs and metabolites during a single run of an aliquot of a urine sample through the LC-MS machine.

101. Unlike point-of-care UDT, LC-MS UDT results are not available for the immediate management of the patient. In some situations, LC-MS UDT results are not available until several days later.

102. When a definitive test is performed on an LC-MS device, there is no medical

22

purpose or reason for the LC-MS simultaneously to report "presumptive results" because definitive results contain the same information that a presumptive test provides, and more.

103. Depending on the needs of each patient, if a provider receives a normal presumptive screen, it may not be necessary to conduct a definitive screen at all.

104. Routinely performing both presumptive and definitive testing on the same day on the same beneficiary is not reasonable and necessary (and thus not reimbursable) without proper documentation as to the provider's rationale for simultaneous testing detailed for each individual beneficiary. Ordering both a presumptive and a definitive test on the same day on the same beneficiary on a regular basis across a large majority of a practice's patient base is suspect, because not all patients have the same needs.

105. Classifying patients as "high risk" does not generally substitute for a provider's independent medical judgment on the needs of each patient.

106. Often, an LC-MS runs the same set of tests on all samples for the technical convenience and cost-effectiveness of the laboratory—irrespective of whether or not all of those tests are medically reasonable and necessary.

107. The laboratory, however, may only bill FHBP for those tests that are medically reasonable and necessary to treat the beneficiary.

108. To be a "covered service" and eligible for payment by Medicare, UDT claims must comply with Palmetto's Local Coverage Determination L35724, *Controlled Substance Monitoring and Drugs of Abuse Testing* ("LCD"). This LCD covers services performed on or after October 1, 2015. Other similar LCDs applied before that. The LCDs provide guidance on services that are not medically reasonable and necessary under 42 U.S.C. § 1395y(a)(1)(A).

23

109. The LCD covering UDT claims has changed over time, but the provisions relevant to this case have remained the same throughout the relevant time period.

110. A "standing order" is defined as a "[t]est request for a specific patient representing repetitive testing to monitor a condition or disease for a limited number of sequential visits[.]" LCD L35724 at 4. "Routine standing orders for all patients in a physician's practice are not reasonable and necessary." LCD L35724 at 13.

111. A "blanket order" is defined as a "[t]est request that is not for a specific patient" but instead is "an identical order for all patients in a clinicians' practice without individualized decision making at every visit." LCD L35724 at 5. Under LCD L35724, UDT performed pursuant to a blanket order is not reasonable and necessary and therefore not eligible for reimbursement. LCD L35724 at 13.

112. Reflex testing is "[l]aboratory testing that is performed 'reflexively' after initial test results to identify further diagnostic information essential to patient care. This testing is not necessarily based on a specific physician's order." LCD L35724 at 5.

113. Further, "[r]eflex definitive UDT is not reasonable and necessary when presumptive testing is performed at point of care because the clinician may have sufficient information to manage the patient." LCD L35724 at 13.

114. Similarly, "the same physician-defined profile is not reasonable and necessary for every patient in a physician's practice." LCD L35724 at 8.

115. UDT orders must be "individualized based on clinical history and risk assessment, and must be documented in the medical record." *Id.*

24

116. G0431 and G0434 were the Medicare-accepted CPT codes corresponding to presumptive UDT in 2011-2015. In 2016, the Medicare-accepted presumptive UDT CPT code was G0479. The codes changed to 80305-80307 in 2017, and those codes are still operative today.

117. At all times relevant to this Complaint, Defendants billed for presumptive UDT services using, for example, CPT G0479 or CPT 80307.

118. Until January 1, 2016, labs submitted individual claims lines and procedure codes for each drug type included in a definitive UDT service. Beginning on January 1, 2016, Medicare required labs to bundle definitive UDT using the following CPT codes:

| G0480 | Drug test(s), definitive … qualitative or quantitative, all sources, includes specimen validity testing, per day; 1-7 drug class(es), including metabolite(s) if performed |
| G0481 | Drug test(s), definitive … qualitative or quantitative, all sources, includes specimen validity testing, per day; 8-14 drug class(es), including metabolite(s) if performed |
| G0482 | Drug test(s), definitive … qualitative or quantitative, all sources, includes specimen validity testing, per day; 15-21 drug class(es), including metabolite(s) if performed |
| G0483 | Drug test(s), definitive … qualitative or quantitative, all sources, includes specimen validity testing, per day; 22 or more drug class(es), including metabolite(s) if performed |

119. The more drug classes associated with the code, the larger the reimbursement rate. For example, services billed using CPT G0481 are reimbursed at a higher rate than services billed using CPT G0480.

120. The following table defines these codes and their corresponding 2023 Medicare reimbursement amount:

| Definitive UDT Code | Definition | 2023 Medicare Reimbursement |
|---|---|---|
| G0480 | Definitive drug testing for 1-7 drug classes, including metabolites. | $114.43 |

25

| | | |
|---|---|---|
| G0481 | Definitive drug testing for 8-14 drug classes, including metabolites. | $156.59 |
| G0482 | Definitive drug testing for 15-21 drug classes, including metabolites. | $198.74 |
| G0483 | Definitive drug testing for 22 or more drug classes, including metabolites | $246.92 |

*See id.*; 2023 Clinical Diagnostic Laboratory Fee Schedule, available at https://www.cms.gov/license/ama?file=/files/zip/23CLABQ1.zip (last visited April 14, 2025).

121. Defendants had access to the LCDs and applicable FHBP laws, regulations, and program instructions at all times relevant to this Complaint.

122. The United States regularly pursues false claims related to improperly billed and medically unnecessary UDT, including but not limited to the following cases: *United States ex. rel. Johnson v. Kelly et al.*, Case No. 20-00018-JD (Western District of Oklahoma); *United States ex. rel. Alt v. Anesthesia Services Associates, PLLC, et al.*, Case No. 3:16-cv-549 (Middle District of Tennessee); *United States v. Hart*, Case No. 4:19-cv-003320JAJ-CFB (Southern District of Iowa).

123. **<u>Psychological and Neuropsychological Testing</u>**. Psychological and neuropsychological tests are diagnostic tests used to assess a person's cognitive, emotional, and behavioral functioning. Such tests are used by clinicians to aid in the diagnosis and treatment of patients with known or suspected mental disorders or dysfunction.

124. Defendants billed for such assessments by using some of the following exemplar CPT codes: 96102, 96103, 96120, G0396, 96132, 96136, 96138, 96146, G0442, G0444, and 96127.

125. "Psychological and neuropsychological testing services utilize diagnostic tests when mental illness or brain dysfunction is suspected, and clarification is essential for the

26

diagnosis and treatment." *Psychological and Neuropsychological Testing Codes for Psychologists, available at* https://www.apaservices.org/practice/reimbursement/health-codes/testing#:~:text=Psychological%20and%20neuropsychological%20testing%20services,for%20the%20diagnosis%20and%20treatment (last visited April 14, 2025).

126. Like all diagnostic tests, psychological and neuropsychological tests are only reasonable and necessary where they are "ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a); *see also* 42 U.S.C. § 1395y(a)(1)(A).

127. Defendants had access to applicable FHBP laws, regulations, and program instructions at all times relevant to this Complaint.

128. The United States regularly pursues false claims related to improperly billed and medically unnecessary psychological testing, including but not limited to the following cases: *United States v. Hart*, Case No. 4:19-cv-003320JAJ-CFB (Southern District of Iowa).

129. **Allergy Testing**. Palmetto is the MAC contractor for this category of services performed in Tennessee.

130. To be a "covered service" and eligible for payment by Medicare, allergy skin testing claims must comply with Palmetto's Local Coverage Determination L33417, *Allergy Skin Testing*. This LCD covers services performed on or after October 1, 2015. The LCDs provide guidance on services that are not medically reasonable and necessary under 42 U.S.C. § 1395y(a)(1)(A).

27

131. The LCD covering allergy testing has changed over time, but the provisions relevant to this case have remained the same throughout the relevant time period. For example, it has always been true that the testing must be medically necessary to be reimbursable.

132. According to LCD L33417, testing is covered "when a patient presents with clinically significant allergic history or symptoms that are not controllable by empiric conservative therapy." LCD L33417 at 2.

133. Testing must correlate specifically to the patient's history and physical findings.

134. Documentation supporting medical necessity should be maintained in the patient's medical record, and the selection of antigens should be individualized and based on specific details obtained and documented within the history and physical examination. *Id.* at 4.

135. Allergy testing is not a common diagnostic tool for pain management.

136. Defendants had access to the LCD and applicable FHBP laws, regulations, and program instructions at all times relevant to this Complaint.

137. The United States regularly pursues false claims related to improperly billed and medically unnecessary allergy testing, including but not limited to the following cases: *United States ex. rel. Saidani v. NextCare, Inc.*, Case No. 3:11-cv-141 (Western District of North Carolina); *United States ex. rel. Granger v. NextCare, Inc.*, Case No. 3:09-cv-535 (Western District of North Carolina).

<b>THE FRAUDULENT SCHEMES</b>

**A. The Pain Institute's Formation**

138. In 2012, Debbie and Michael Cox decided to open a clinic: the Pain Institute. Debbie Cox opened the clinic in February 2012, and that same year she asked her husband Michael to quit his job as a sales representative in medical sales to come work with her in the clinic.

28

139. After joining the Pain Institute, Michael Cox was involved in the business side of the clinic from the beginning. He handles the business side of the Pain Institute, including finances, payroll, and ordering supplies. Michael Cox is paid $35,000.00 per month by the business as a W-2 employee, and his wife Debbie receives member draws from the business.

140. The clinic's business is pain management.

141. The Pain Institute's primary location is 1849 Madison Street, Clarksville, Tennessee. The clinic has always operated out of Suites E and F of 1849 Madison Street.

142. The clinic opened a second location called the Whitehouse Pain Institute, but that location eventually closed, and the Coxes moved it to Springfield, Tennessee. There is also a location at 502 Northcrest Drive, Springfield, Tennessee 37172; it is linked to the Pain Institute as a D/B/A. Both the Whitehouse and Springfield clinics were or are owned by the Pain Institute.

143. The Coxes both managed the clinic and its other locations throughout the relevant time period to this Complaint. Both Coxes exercised managerial control over the clinic and the laboratory's operations.

144. Debbie Cox performed procedures at the clinic as a nurse anesthetist until November 2016. After that, she continued managing the clinic with her husband Michael.

145. Through their clinic-related entities, including Pain Institute of Nashville, PLC and Clarksville Pain Institute, LLC, Michael and Debbie Cox employed certain medical providers during the relevant time period, including but not limited to: Meghan Anderson, Jennifer Bilbrey, Catherine Bixby, Howard Bromley, Edith Dean, Lorissa Dias, Antonio Eddings, Erin Gardiner, Sarah Givens, Ilyssia Greer, Joshua Holt, Pamela Montgomery, Jennifer Osborne, Jennifer Peguese, Tanya Roberge, McKenzie Smartt, Kelly Smart, Jianping Sun, John Stanton, Phyllis Taylor, Ashley Tinch, Brandon Tolman, Todd Ussery, Jaquetta Wolf-King.

29

146. The Pain Institute was never a large business like a hospital system or publicly traded healthcare company. It did not have a compliance department, a legal department, or a multitude of middle managers. Michael and Debbie Cox were always intimately involved in managing the clinic's business and operations. They chose which employees to hire and managed them. They chose which therapies and services the clinic would offer, and they both closely monitored how much testing the clinic and the laboratory were doing. At all times relevant to this complaint, they exercised control and domination over the clinic-entities.

## B. Defendants' Profit Motive & Business Practices

147. Pain Institute employees knew Michael and Debbie Cox to regularly engage in suspicious business practices, including billing for medically unnecessary services and testing. The Coxes regularly rewarded employees who performed more testing with gifts and more money and threatened to fire employees whose testing numbers were too low. Michael and Debbie Cox systematically pressured providers and employees to bill for medically unnecessary services by threatening to fire employees who did not order more testing and rewarding employees who cooperated with their schemes.

148. One employee, Employee #1,[3] who worked at the Pain Institute between 2018 and 2022 as a medical assistant and eventually became the office manager, felt that that employee was "the office manager in name only" because final decisions were always made by Debbie and Michael Cox. The employee always felt undermined by the Coxes.

149. Another employee, Employee #2, who worked at the Pain Institute between 2015 and 2018 and also eventually became the office manager, opined that employees should not

---

[3] This Complaint refers to various employees and mid-level providers anonymously as Employee #1 and so on, and various patients as Patient #1 and so on.

30

question Michael or Debbie Cox as the retaliation was bad and that the Coxes instilled fear by threatening to fire anyone who didn't do what they (the Coxes) said.

150. According to at least one former Pain Institute staffer, Employee #3, who worked the front desk at the Pain Institute between roughly 2018 and 2023, and the Coxes wanted to hire young employees they could mold and who would act at their direction. They purposefully hired people who would do what they said without asking questions.

151. According to Employee #2, the Coxes regularly manipulated staff into doing what they wanted. To that end, the Coxes hired young people who needed money and would work for little pay. Michael and Debbie Cox cut staff's pay, threatened to fire people, bought expensive gifts for certain employees, and then gave those gifts in front of everyone else. The message was that if staff did what the Coxes wanted, they could be treated the same way. The Coxes also took certain providers to the Bahamas or gave out large amounts of money at Christmas parties to reward their favorites.

152. Michael Cox specifically linked employee salaries to the number of tests they performed. Michael Cox told one employee who worked at the Pain Institute between 2020 and 2022, Employee #4, that the employee needed to test patients ten times per day with a certain kind of blood flow test. Once the employee started doing the testing as their primary job, Michael Cox increased the employee's pay from $16.00 per hour to $18.00 per hour. Michael Cox told the employee that – if the employee did not keep up the number of tests per day – Cox might have to lower the employee's salary back to $16.00 per hour. When the employee asked providers why they were ordering this kind of testing, they could not answer and said that they did not really know why the test was ordered. Providers would send the results of these tests to the patient's primary care provider, and patients would come back and tell their provider at the Pain Institute

31

that their primary care provider did not understand why the test was ordered. The employee concluded that the testing was ordered to generate revenue rather than help patients.

153. Michael and Debbie Cox targeted Medicare patients for increased services to maximize revenue. They regularly discussed insurance reimbursement rates with staff and made comments about how much Medicare would pay for certain things. If an insurer paid a significant amount for a service, the Coxes targeted those patients for more services. Conversely, if the reimbursement rates were not good, the Coxes and the clinic made those patients pay in cash despite the clinic having a contract with their health insurer.

154. Patients came from as far as West Virginia and East Tennessee to get pain medications at the Pain Institute. Entire families came to the Pain Institute and got controlled substances prescribed to them.

155. Patients generally understood that to receive their prescribed pain medications, including opioid medications with high addictive potential, they had to also accept the level of testing and other services, durable medical equipment, and/or pain creams offered by the clinic.

156. The business model was based on a "tests-for-pills" *quid pro quo* where in general, patients would accept levels of testing that seemed excessive or unnecessary, or accept other services pushed on them by the Pain Institute like allergy testing, and still get their medications.

157. Despite having no medical training, Michael Cox would often try to manipulate processes and influence/intimidate providers into treating patients in more profitable ways.

158. Debbie Cox requested and received from Pain Institute staff a daily report on tests and services rendered that day, including how many patients each provider had seen, how much diagnostic testing had been performed, and whether injections had been performed.

32

159. The Coxes routinely made decisions for patient care based on profit rather than in the best interests of patients. These decisions often resulted in providers rendering medically unnecessary care to patients.

160. The Coxes were always looking for ways to "trim the fat" and make more money, and routinely explored offering diagnostic therapies to patients solely for money. Employees repeatedly told Michael Cox that patients did not want diagnostic testing. He would ask why the numbers on procedures were low, and staff would tell him what patients had said. Employee #1 explained that "it felt like knocking my head against the wall to make him understand that."

161. As another example, an employee who operated X-ray machines at the Pain Institute for providers who performed injections between 2020 and 2022, Employee #5, did not have any of the required certifications to operate an X-ray machine. But Michael Cox told this employee not to worry about getting certified. When the employee realized that X-ray operators needed to be certified, the employee immediately began looking for another job after realizing what Michael Cox had told the employee was not true.

162. The Coxes' focus on maximizing profits led to directives to providers and employees to conduct medically unnecessary UDT, allergy, and psychological testing.

163. The Coxes directed providers to bill more UDT through standing orders and reflex testing. These strategies were designed to maximize profits to the Coxes from the excessive UDT of the Pain Institute's patients. Through standing and blanket orders, the Coxes pressured providers to order more UDT with higher rates of reimbursement. Through reflex testing, the Coxes maximized the profit they could squeeze out of each patient through mandatory re-visits every 28 days and consistently conducting presumptive and definitive UDT simultaneously.

33

164. The Coxes were warned for years by employees, consultants, and insurers that they were billing for services and tests that were not medically necessary. They were told many times that their medical record-keeping was insufficient. Audits, emails, and text messages did nothing to dissuade them to change their practices.

165. Between April 10, 2014, and May 9, 2024, the Pain Institute was paid more than $15 million by Medicare and approximately $210,000.00 by the VA for UDT, allergy testing, and psychological testing. The Pain Institute was paid roughly $14.2 million for UDT, roughly $135,000.00 for allergy testing, and roughly $714,000.00 for psychological testing by Medicare.

## C. The Urine Drug Testing Scheme

### 1. The Clinic's UDT Operation

166. As explained above, UDT – when medically necessary – can be used to monitor patients' prescription usage. This case is about medically unnecessary UDT ordered at the direction of the Coxes to maximize revenue from the lab they owned.

167. The Pain Institute has had an onsite lab for processing urine drug screens since the early days of the clinic. The lab was always part of the clinic, and the same billers always did the billing for the clinics and lab. There is no separate lab entity, and the Coxes own the lab through the clinic entities. The lab is in the same building as the clinic, but in a different suite, Suite D. When the Pain Institute started the lab, it hired consultants at Nue Medical Group to set the lab up.

168. The Pain Institute owns an LCMS machine, an API 4,000, that sits in the lab space. The clinic has used the same machine in the lab since 2014. In a text message soliciting a physician to join the Pain Institute in February 2022, Debbie Cox stated regarding the LCMS machine, "That machine is a game changer and will pay for itself within a few months. There is special chart verbiage and cpt codes not to over or under bill or be put on CMS' radar."

34

169. The clinic has always tracked how much UDT was being conducted at all clinic locations through an Excel spreadsheet demonstrating how many tests per month were conducted and how those tests broke down by payor. Michael Cox tracked the Pain Institute's UDT on a weekly basis. Debbie Cox received daily reports on how much UDT each provider had done that day.

170. As discussed later, the Coxes structured the clinic's UDT program through directives to providers to bill more UDT than patients needed.

171. The results of these directives from the Coxes to over-test are reflected in medical records that are often incomplete or lack documentation of test results, provider orders, and patient discussions.

172. The Pain Institute's providers followed the Coxes' instructions to bill more UDT. They implemented the Coxes' directives because if the providers did not follow the directives, then they would be fired.

173. Because opioid patients typically keep returning to pain management clinics for narcotics with high potential for addiction, the Pain Institute's patients were a captive market.

174. In some of the representative patient files below, the Pain Institute performed so much UDT that it sometimes missed troubling test results.

175. In general, though many providers have documents or policies guiding treatment choices for UDT, at the Pain Institute, whatever the policy was on paper, the real policy was verbally articulated by Michael and Debbie: testing was mandatory every 28 days.

176. Providers at the Pain Institute routinely tested patients every 28 days. Patients sometimes asked providers why they were being tested again if they were just tested the month before. They would ask things like, "didn't I just do this last month?"

35

177.    The Pain Institute's policies and procedures, drafted in 2018, explicitly stated its UDT Policy: "Urine drug screens are mandatory at the Institute." The Pain Institute's newer patient forms contained the same statement that each new patient had to sign: "Urine drug screens are mandatory at the Institute."

178.    At times, the Pain Institute tried to paper over their actual practices by drafting policies regarding UDT.

179.    In one example, a provider, Jianping Sun, MD, the medical director for CPI and PIN in 2014 through 2016, signed an undated policy called "Urine Drug Screen Policy."

180.    The policy purported to divide patients into three categories of risk: high, medium, and low. High risk patients would receive UDT on every visit, a medium risk patient would receive UDT 8 times a year, and a low-risk patient would receive UDT 4 times a year.

181.    Under this policy, patients could be designated as high risk for any number of reasons that had nothing to do with their own personal medical history, like simply being a new patient.

182.    An authentic and accurate depiction of part of that policy is depicted below:

36

## URINE DRUG SCREEN POLICY

Clarksville Pan Institute and White House Pain Institute policy on UDS screening for patients on opioid therapy. The providers will designate high risk, medium risk and low risk patient categories. The high risk patient will be given a UDS on each visit to assure that the patient is compliant. A medium risk patient will be given UDS drug screen 8 times a year to assure the patient is compliant. A low risk patient will be given a drug screen 4 times a year to make sure the patient is compliant.

### HIGH RISK PATIENT (UDS on every visit)

A patient that is on the morphine equivalent of 120 or more will be deemed a high risk patient. A patient that test positive for an illicit drug will be deemed a high risk patient. A patient that is not taking their medicine as prescribed will still be considered a high risk patient. A patient that has no metabolites in there system will be considered a high risk patient. A patient that is on benzo's will also be considered high risk. A patient with an ORT score of 8 or higher will be considered high risk. A patient with a SOAP-R score of 21 or higher will be considered a high risk patient. A new patient will be considered high risk until the provider determines their level of risk. The follow up visits will also be tested for the first 90 days. The provider will classify a high risk patient using their level of experience and comfort level while dealing with a patient on opioid therapy.

183. But not only is the level of testing above inconsistent with the LCDs on UDT, but it is the definition of a blanket order in the LCD: "[t]est request that is not for a specific patient; rather, it is an identical order for all patients in a clinician's practice without individualized decision making at every visit."

184. The language above also meets the definition of a standing order in the LCD: "individualized orders for certain patients for pre-determined tests based on historical use, risk, and community trend patient profiles[.]"

### 2. The Coxes Supervised the UDT Operations

185. The Coxes structured the Pain Institute's UDT program by using canned medical record language, blanket orders, standing orders, reflex testing, billing for presumptive and definitive UDT on the same day, and structuring patient visits every 28 days to maximize UDT

37

profits. Providers' orders for UDT were not specific to the medical needs of patients and were not based on individualized decision-making at each patient's visit.

186. Since at least 2014, the Coxes and the entities articulated a policy of blanket and standing orders in their practice for urine drug screens.

187. These blanket and standing orders were consistently disseminated to Pain Institute staff in various ways by Debbie and Michael Cox over the years, sometimes in text messages to staff, sometimes in office policies, sometimes in person to staff, and sometimes in emails to staff.

188. Since at least 2014, the Coxes and the Pain Institute had a policy of reflex testing, where patients would be tested for presumptive and definitive UDT without an individualized determination of the clinical appropriateness of the subsequent definitive test on the same date of service every 28 days.

189. These directives overlapped. The goal was to test as many patients at the highest level of testing as possible to make money. The Coxes always pushed for more testing.

190. The standing and blanket orders disseminated by Michael and Debbie Cox are evidenced in several ways. As discussed below, witnesses describe the intimidation tactics used by both Michael and Debbie Cox to get providers and employees to do more testing. For instance, one registered nurse, Jennifer Bilbrey, told Debbie Cox about UDT in 2022: "**I know they make the clinic \$\$\$ but I believe what I read in the guidelines was half the number per year compared to what Michael would like us to do**." (emphasis added). And medical records, described later in this complaint, reveal that almost none of the UDT ordered by the providers at the Coxes' direction was medically necessary.

191. The fact that these tests were not medically necessary is underscored by the fact that the Pain Institute consistently billed at the highest levels of definitive UDT (with the G0483

38

code), that none of the presumptive analyzer UDT was reviewed because the results were reported simultaneously with the definitive results, and the fact that the Coxes were always pushing providers to do more testing.

192. There is a reason that the Pain Institute was doing so much UDT across different sets of providers, across hundreds of patients with different medical needs, and across time: because Michael and Debbie Cox knew exactly how much money they made from each urine drug screen, and because they wanted more money. That factor was the constant.

193. Michael Cox would intimidate and pressure providers like nurse practitioners into ordering more UDT, telling them things like "it's your license" and "it's on you if you don't order a drug screen." He pressured these providers to order more UDT when their testing numbers got too low because it was a numbers game.

194. If the Pain Institute did not have certain numbers for UDT, the Coxes – especially Debbie Cox – got mad. Both Coxes threatened providers to order more UDT. Debbie Cox would message providers and ask why their UDT volume was not higher. Employees would tell each other that "Debbie is on a rampage" and when she wanted to know why the provider had ordered a certain low number of UDTs. Debbie Cox threatened to fire people, telling them to order more UDT or find another job. According to Employee #5, Debbie Cox always wanted the testing numbers to be higher.

195. While some providers at times refused to order more UDT in the face of this pressure if they felt a patient did not need it, other providers, including Edith Dean and Jennifer Bilbrey, would do whatever Michael Cox told them to. Even when certain patients had failed drug screens, the Coxes put pressure on providers to write prescriptions for controlled substances for

39

those patients, demonstrating that the drug screens were not used to guide medical decision-making and patient care.

196. During one winter between 2020 and 2022, when the clinic was closed due to snow, staff received threatening messages from the Coxes, telling them that they (the Coxes) were missing out on money to be made from UDT while the clinic was closed.

197. The Coxes frowned on providers discharging patients who were trying to cheat urine drug screens. One provider who worked at the clinic between 2015 and 2016, Employee #6, discharged several patients after they attempted to beat a urine drug screen by taping a balloon to their leg and inserting a pill bottle into their vagina. Michael and Debbie Cox did not like that the provider had discharged patients because it meant less revenue if too many patients were discharged, and the Coxes discouraged such discharges going forward.

198. Employees at the Pain Institute generally believed that the clinic was performing a high and concerning level of UDT.

199. On September 1, 2015, an employee of the Pain Institute, Kerri, emailed Michael Cox with the subject heading, "medical necessity for UDT's for chronic pain patients."

200. She stated, "HI Michael [sic], See below. Kerri." Below this line, she wrote: "This patient is a chronic pain patient that is using opiates/opioids and or on other schedule 2 and 3 medications. Because of the risk of abuse with other prescribed medications of the same nature not prescribed by this clinic and illicit drugs of abuse, I am ordering this drug test out of medical necessity for this patients safety and efficacy and to prevent to the best of my ability this patient to abuse any prescribed or illicit/illegal drugs."

201. Michael Cox replied on September 2, 2015, "Thanks!"

40

202. Upon information and belief, this employee was drafting and circulating to Michael Cox for his review language for standing orders in a patient's medical record so that UDT could be billed with more frequency.

203. This same language appears verbatim in patient files discussed below in the Representative Patients section.

204. The Coxes and their agents and consultants for the Pain Institute were always trying to maximize what they could bill for UDT. Whether any patient needed a certain level of UDT was not relevant to what they billed to FHBP.

205. On February 16, 2016, at 10:46 am, Michael Cox forwarded the Pain Institute's billers at the time, Ron Wood and Michelle Sandlin of Medical Data Services, an email from Andrew "Andy" O'Hara, the CEO of Nue Medical Consulting, Inc. The forwarded email noted that Cigna had released its new UDT policy for 2016 and that Cigna had declared CPT codes G0482 and G0483 (both definitive UDT codes) "medically unnecessary." The maximum number of dates of service and maximum number of units for which Cigna would reimburse for UDT were highlighted. The CPT codes that Cigna had declared medically unnecessary were highlighted.

206. Later that same day, on February 16, 2016, at 3:16 pm, Ron Wood and Michelle Sandlin sent Michael Cox an email with the subject heading, "Cigna Drug Screens." Ms. Sandlin stated that Cigna would no longer pay the code G0483 for UDT because it was medically unnecessary. Ms. Sandlin further stated: "Also, I am going to try something and see IF Cigna will pay this way…I am going to test 1 claim with billing G0480 x2 units ($79.94 x2=$159.88 allowed) IF filing this way will pay, then we will start to bill them out like this as it would be a higher allowed amount!"

41

207. On June 26, 2017, Michelle Sandlin sent Michael Cox an email with the subject heading "G0483/Medicare." In that email, Ms. Sandlin noted that Medicare was conducting a widespread review of G0483 claims for medical necessity.

208. On November 3, 2017, Michelle Sandlin sent Michael Cox the Medicare LCD then currently applicable to the code G0483. Ms. Sandlin specifically marked up the LCD on UDT, noting which issues did not apply to the Pain Institute. She emailed this annotated LCD to Michael Cox.

209. She specifically pointed out in her email: "**Blanket Orders…this is the actual office policy to test each patient across the board. This is NOT [sic] medically necessary per Medicare Guidelines**." (emphasis added).

210. Ms. Sandlin also noted in this email that routine standing orders were not necessary, and that "**Confirmation UDS is NOT [sic] medically necessary UNLESS [sic] the POC/Analyzer is negative when it should be positive**." (emphasis added).

211. An authentic and accurate depiction of that email and the markup Ms. Sandlin sent Michael Cox as an attachment to that email appears as follows:

42

| From: | "Michelle Sandlin" <msandlin@mds.ws> |
|---|---|
| Sent: | Fri, 3 Nov 2017 16:01:38 -0500 (CDT) |
| To: | "miccox@aol.com" <miccox@aol.com> |
| Subject: | Drug Screen |
| Attachments: | drugscreen_171103160545_0001.pdf |

Michael,

Attached is the Medicare LCD (Local Coverage Determination) that outlines the basis for the Medical Necessity for G0483 (18 panel UDS.)

Page 2 shows the Background and some of the descriptions to some of the requirements and reasons for denials.

Page 3 actually shows the Indications for Medical Necessity. One or more of these reasons should be documented in the chart in order to establish the Medical Necessity.

1. Identify a specific substance or metabolite that is inadequately detected by a presumptive UDS screen. (I would not think that this would apply to any Analyzer samples as you truly don't have results until after the UDS is performed and the Analyzer results are your proof)

5. Identify a negative, or confirm a positive, presumptive UDS result that is inconsistent with a patient's self-report, presentation, medical history, or current prescribed pain medication plan. (again, this is one that you can't truly use for the Analyzer samples as you don't have the results before ordering the UDS)

Page 4 shows reasons that the UDS is non-covered. I have put an x through those that I don't think apply to your practice.
1. Blanket Orders...this is the actual office policy to test each patient across the board. This is NOT medically necessary per Medciare Guidelines.
2. If the patient admits to unauthorized use of a drug, Medicare does not cover performing the UDS just to confiirm the patient's story.
3. Routine standing orders...not medically necessary. See definition of standing order on page 1.
5. Confirmation UDS is NOT medically necessary UNLESS the POC/Analyzer is negative when it should be positive. (again, the Analyzer results are not same day results so this would technically apply to the POC only.

Documentation is key to all of this and making sure that the documentation falls within the reasoning on Page 3. The providers need to make sure to get specific about the wording of WHY the UDS is needed.

I hope this information helps guide you on how to change the documentation for the UDS so that it is more definitive in the Medicare Reasons for Medical Necessity.

Michelle Sandlin
Medical Data Services, LLC
211 McMillin Street
Nashville, TN 37203
615-369-6500
fax 615-866-3935
email: msandlin@mds.ws

43

Some labs offer comprehensive definitive drug testing panel (CDDP) of 40 or more drugs it is not reasonable and necessary to bill individual billing codes for this comprehensive testing.

**Limitations**

The following are non-covered services:

1. Blanket Orders

2. Reflex definitive UDT is not be reasonable and necessary when presumptive testing is performed at point of care because the physician may not need to order definitive testing (e.g., the patient admits to a particular drug and the clinician is satisfied that he or she knows everything he or she needs to know, or the IA cut-off is sufficiently low that the physician is comfortable with the test result).

3. Routine standing orders for all patients in a physician's practice are not reasonable and necessary. Physician-defined standing orders for pre-determined drug panels according to specific patient profiles for a limited sequential period may be reasonable and necessary and must be documented in the patient's medical record.

4. Individual definitive CPT codes when a CDDP is ordered

5. Confirmation/definitive identification of a presumptive UDT negative result is not reasonable and necessary except when a patient on a prescribed medication should have had a presumptive positive result.

6. IA testing, regardless of whether it is qualitative or semi-quantitative, may not be used to "confirm" or definitively identify a presumptive test result obtained by cups, dipsticks, cards, cassettes or other CLIA-waived methods. Semi-quantitative IA testing provides a presumptive test (numerical) result. Definitive UDT provides specific identification and/or quantification by GC-MS or LC-MS/MS.

7. Drug testing of two different specimen types from the same patient on the same date of service for the same drugs/metabolites/analytes.

8. UDT for medico-legal and/or employment purposes or to protect a physician from drug diversion charges.

9. Specimen validity testing including, but not limited to, pH, specific gravity, oxidants, creatinine.

10. CDDP panels are non-covered.

212.    Michael Cox was warned that the level of testing the Pain Institute was conducting at his direction was not medically necessary.

213.    On October 17, 2018, Ron Wood sent Michael Cox the LCD on UDT again. In this email, Mr. Wood stated, "This outlines the objectives and Medical Necessity Guidance. It states RANDOM [sic] testing performed 1-3 times every 3 months for high risk patients. It shows any additional UDT beyond recommendations and lists the reasons for the additional UDT."

214.    On March 29, 2022, Debbie Cox exchanged text messages with Megan Bibb Rabbitt, the Pain Institute's biller, and Michael Cox. In that exchange, Rabbitt noted that TRICARE was denying UDT claims by the Pain Institute, stating that they were medically

44

unnecessary. Debbie Cox responded with this question: "Do you respond that the patient is high risk for overdosing or that they're on a benzo antidepressant or sleep aid.? [sic] Which puts them at high risk for overdosing?" Rabbitt stated: "It was because we were using the code G0483. They state it is too high of a code for what is done. We have changed the code to G0482 and I am hoping this will take down the denials."

215. Debbie Cox's question with a suggested response to TRICARE ignores the medical needs of any specific patient; instead, her suggested response wholesale classifies people as high risk based on factors that may or may not be specific to any one patient. Megan Bibb Rabbitt is not a medical provider. And in 2022, it had been years since Debbie Cox had regularly seen patients at the Pain Institute.

216. Changing the coding on a group of patients who all have the same insurance without the input of a provider has nothing to do with medical necessity. Further, the text exchange reflects that Debbie Cox knew that TRICARE had been denying the Pain Institute's UDS claims as medically unnecessary because the code used – G0483 – was too high and improper.

217. An authentic and accurate depiction of that message (numbers redacted) follows:

45



💬 Redacted ███

DC  Debbie Cox ‹ Redacted ›  3/29/2022, 6:11 AM

Attachment: ~_Library_SMS_Attachments_57_07_988E0080-3053-4D19-A78D-040DB219D6EC_voicemail.wav (1 MB)

MR  Megan Rabbit Redacted  3/29/2022, 7:22 AM
Talked to her yesterday

DC  Debbie Cox Redacted  3/29/2022, 7:32 AM
Thank you

DC  Debbie Cox Redacted  3/29/2022, 10:29 AM
Even though tricare is still pulling charts on every patient for insurance claims, do they still deny claims if so what is it mainly office visits, uds, psych test etc

MR  Megan Rabbit Redacted  3/29/2022, 10:31 AM
Just UDS. But I attempt to appeal them.

DC  Debbie Cox Redacted  3/29/2022, 10:32 AM
Why do they not pay? Medically unnecessary? Is it for lower MED D's

MR  Megan Rabbit Redacted  3/29/2022, 10:42 AM
State it is not medically necessary.

DC  Debbie Cox Redacted  3/29/2022, 10:44 AM
Do you respond that the patient is high risk for overdosing or that they're on a benzo antidepressant or sleep aid.? Which puts them at high risk for overdosing?

MR  Megan Rabbit Redacted  3/29/2022, 10:56 AM
It was because we were using the code G0483. They state it is too high of a code for what is done. We have changed the code to G0482 and I am hoping this will take down the denials.

DC  Debbie Cox Redacted  3/29/2022, 11:33 AM
Why is G0483 too high? Does it test for more elicits drugs that are rarely seen?

MR  Megan Rabbit Redacted  3/29/2022, 12:08 PM
We only test for 17 drug classes. G0483 is 22 or drug classes. G0482 is 15-21 drug classes.

218. Debbie Cox was warned that the level of testing the Pain Institute was conducting at her direction was not medically necessary.

219. On April 5, 2022, Debbie Cox exchanged text messages with two providers at the Pain Institute, Edith Dean and Jennifer Bilbrey. Debbie Cox initiated the conversation by stating, "Good morning ladies! Just making sure you are doing random drug screens with high- medium - low risk parameters."

46

220. Jennifer Bilbrey responded that the providers were confused about how often they were supposed to be doing UDT. She told Debbie Cox, "I will do them however often you tell me I need to do them[.]"

221. Bilbrey also said that the guidelines for the number of UDT screens from the then-medical director of the Pain Institute, Dr. Tolman, were "lower than Michael has told us he wants per year[.]"

222. Bilbrey also said, "**I know they make the clinic $$$ but I believe what I read in the guidelines was half the number per year compared to what Michael would like us to do**." (emphasis added).

223. She also said, "I have felt we do them too often and even though it's easy to justify on some there's a lot of patients that we can't justify doing them more than 4-6 times per year."

224. Debbie Cox responded that she received daily numbers from all the providers, and that many of the patients were not "cookie cutter" patients. Yet at this time, in 2022, it had been years since Debbie Cox had actually treated a patient at the Pain Institute, so she should not have been in a position to know if the patients were cookie cutter or not.

225. Edith Dean then responded in the chain, "**Michael had told us everyone would be a yes and the lab would decide**." (emphasis added).

226. Jennifer Bilbrey said, "We have been testing everyone, every month for the last 3 months (maybe longer)."

227. An authentic and accurate depiction of that message (numbers redacted) follows:

47

**DC**    Debbie Cox REDACTED             4/5/2022, 6:21 AM

Good morning ladies!Just making sure you are doing random drug screens with high- medium -low risk parameters.

**JB**    Jennifer Bibrey REDACTED             4/5/2022, 6:31 AM

I do have some questions about the drug screens because last time Michael had spoken to me about them we were still doing a monthly and I'm not sure if we're doing every patient every month and then if it's abnormal they send it off for further testing or if we're still supposed to be picking and choosing who gets drug screening every month it's changed so much that I'm just very confused on how we're supposed to do them because when reading the guidelines from Dr. Tolman the number of drug screens per year is lower than Michael has told us he wants per year so I just want to make sure that I'm doing it right. I know they make the clinic $$$ but I believe what I read in the guidelines was half the number per year compared to what Michael would like us to do. I have felt that we do them too often and even though it's easy to justify on some there's a lot of patients that we can't justify doing them more than 4-6 times per year. I will do them however often you tell me I need to do them and will start making the change today and turning some yes to no for next months UDS

**DC**    Debbie Cox REDACTED             4/5/2022, 6:43 AM

The drug screens are based on the high medium and low risk assessment. A lot of patients are not these cookie cutter patients that fall into those ranges because they'll have a benzo, anti-depressant, sleep aid, there are hospitalized missed appointments no transportation so many factors go into getting a drug screen. At CPI I get daily numbers from all three providers of daily patient load and drug screen no's. SPI stopped sending it to me. Drug screens are at your discretion. 40 % of drug screens are not reimbursed by insurance deemed by them medically unnecessary even when we have data to support. If a patient does not need a drug screen and has been a reliable patient then I would not do a uds unless you find it necessary and they fall into the high medium low risk category.

**EN**    Edith NP REDACTED             4/5/2022, 6:45 AM

I have been a little confused as well. But I started last week changing some to no. Michael had told us everyone would be a yes and the lab would decide.

**JB**    Jennifer Bibrey REDACTED             4/5/2022, 6:47 AM

Liked "I have been a little confused as well. But I started last week changing some to no. Michael had told us everyone would be a yes and the lab would decide. "

**JB**    Jennifer Bibrey REDACTED             4/5/2022, 6:49 AM

We have been testing everyone, every month for the last 3 months (maybe longer). We have all of them placed in a low med high risk category in their chart. I'll check every chart note and update their risk assessment

**DC**    Debbie Cox REDACTED             4/5/2022, 6:49 AM

The new lab manager said to do a uds on everyone because he gets paid for every drug screen regardless if we get paid or not. So of course the new manager wants us to do a drug screen on everyone. That is not happening we are going to follow our risk protocol that was established in 2019 by Jennifer Bolen an Attorney who deals in pain management. So just follow the protocol unless other factors deem a uds medically necessary and are documented to support it.

**DC**    Debbie Cox REDACTED             4/5/2022, 6:50 AM

This is an example of a list I get daily from CPI from each provider

48



Image: ~_Library_SMS_Attachments_22_02_BBB45347-C457-426A-9539-FC57F991475E_IMG_0948.jpg (963 KB)

| | | |
|---|---|---|
| JB | Jennifer Bibrey REDACTED | 4/5/2022, 6:54 AM |

Yes ma'am I will start changing everyone back to how we were doing it And make sure they're wrist factors are documented and adjust their risk assessment based on the last year. I'm sure some of Pam's patient that she has set as low I've already adjusted to a medium or high and vice versa

| | | |
|---|---|---|
| DC | Debbie Cox REDACTED | 4/5/2022, 6:55 AM |

Thank you

| | | |
|---|---|---|
| JB | Jennifer Bibrey REDACTED | 4/5/2022, 6:58 AM |

And before I forget I have reviewed the drug screens for today and they look really good. only thing is that they are still labeled as benzodiazepines or amphetamine and not drug screen

| | | |
|---|---|---|
| EN | Edith NP REDACTED | 4/5/2022, 7:14 AM |

I actually have 2 positive meth today but no confirmation for the d isomer. I have sent John a text.

| | | |
|---|---|---|
| DC | Debbie Cox REDACTED | 4/5/2022, 7:17 AM |

Let me get the label fix

228. These messages show that Debbie and Michael Cox not only controlled the clinic-entities (plus the lab) and directed their operations, but that they were intimately involved in tracking, supervising, directing, and most importantly, presenting for payment claims to Medicare for UDT the clinic was conducting. They were directing the providers how to test. This chain also reflects that – at Michael Cox's instruction – Pain Institute providers were ordering and billing for a higher number of UDT than what those providers felt comfortable ordering through at least late March 2022.

49

229. On June 9, 2022, Bill Heckle at PL Consultants, another consultant for the Pain Institute UDT lab, emailed Michael Cox, enclosing the invoice for his services in May 2022. On the invoice, the quantity of presumptive tests was 960, and the quantity of confirmatory tests was 942. These numbers were so similar because the Pain Institute's practice was to routinely bill both presumptive and definitive/confirmatory UDT on the same day.

230. On July 11, 2022, Mr. Heckle emailed Michael Cox, enclosing the invoice for his services in June 2022. On the June 2022 invoice, the quantity of presumptive tests was 1,112, and the quantity of confirmatory tests was 1,114, reflecting the same practice.

231. On Mr. Heckle's invoice for July 2022, the quantity of presumptive tests was 841, and the quantity of confirmatory tests was 880, reflecting the same practice.

232. On Mr. Heckle's invoice for August 2022, the quantity of presumptive tests was 880, and the quantity of confirmatory tests was 879, reflecting the same practice.

233. On October 26, 2022, Mr. Heckle emailed Michael Cox with the subject heading, "Agreement and Reflexing." In that email, Mr. Heckle quoted the LCD and said, "Regarding reflexing, it looks like reflex testing for your practice lab is not going to work out. CMS has determined that reflex testing is 'not Reasonable' other than at reference labs. You can still use the guidelines for reflex testing which should satisfy the medical necessity (for example to verify presumptive Positives UTD). You can't just automate it without a provider order."

234. Mr. Heckle was telling Michael Cox that testing could not be automated because that is exactly what the practice was doing, as noted by Michelle Sandlin in an earlier email when she told Michael Cox that blanket orders were "the actual office policy."

235. On August 21, 2023, Devyn Stumbo, the Director of Operations for PL Consultants, LLC, sent Michael Cox an email with the subject heading, "CMS Edit." He stated, "Please see the

50

attached letter pertaining to the recent CMS edits causing reimbursement issues." He attached a document titled, "New CMS Billing Edits for Drug Testing," which stated in part: "To summarize, CMS implemented a change in the current policies that resulted in, starting July 1, 2023, claims for definitive drug testing being automatically denied when billed on the same claim with presumptive tests." The document continued to advise the use of a specific modifier code to "bypass this edit."

### 3. UDT Summary

236. All these communications reflect the Coxes' detailed understanding of Medicare billing, coding for UDT, their desire to make as much money as possible off their patients, and their recurrent disregard for repeated warnings from their own providers and billers that the UDT being routinely billed by the Pain Institute was not allowable or medically necessary and reasonable.

237. Whether from their own biller, outside consultants, or from their own provider, all these communications reflect that blanket and standing orders existed at the Pain Institute since at least 2014.

238. Over the years, these communications reflect that the Pain Institute not only implemented blanket and standing orders but engaged in reflex testing.

239. The Pain Institute was still billing presumptive and definitive UDT for Medicare beneficiaries on the same date of service as late as May 2024.

240. Despite being sent the LCD many times by different people, the Coxes continued violating it in multiple ways for years by directing their providers to continue billing for medically unnecessary levels of UDT.

51

241. Despite being informed of the problems with their UDT practices, and on notice that much of their testing was medically unnecessary, the Coxes continued to direct providers to bill high levels of UDT.

242. Defendants knew, recklessly disregarded, or were deliberately ignorant of the requirements for billing UDT to FHBP.

243. Defendants submitted claims to FHBP for UDT services that they knew were not rendered, not medically necessary, not used in the treatment of FHBP beneficiaries, billed pursuant to impermissible blanket orders, and/or not ordered by the treating practitioner.

244. At all times relevant to this Complaint, payments from insurers, including FHBP, for UDT performed at the Pain Institute's in-house laboratory were one of Defendants' primary sources of revenue.

245. Medicare was particularly susceptible to Defendants' fraudulent schemes because it generally does not require a patient co-payment on laboratory services, making patients less likely to refuse to consent to or complain about unnecessary testing.

246. Defendants submitted, and/or caused to be submitted, claims for payment for presumptive and definitive UDT to Medicare and the VA.

**D. The Allergy Testing Scheme**

247. The Pain Institute began performing allergy testing in 2016, when it was still known as Clarksville Pain Institute.

248. The Pain Institute purchased allergy tests from Allervision and Medela Remedium Solutions.

52

249.    The Pain Institute's allergy testing served no pain management objective. The program was about money. There was no medical reason to test pain management patients for allergies to allergens like pollen or mold. Allergy testing has nothing to do with pain management.

250.    Employee #2 described the start of the allergy program as one day, Michael Cox came into the office and said, "we are going to start allergy testing." Michael Cox said that patients would be required to do allergy testing as part of their adjunct therapy. In response to objections from patients that they didn't want the allergy testing (as they already had an allergist or didn't have allergies), the Pain Institute's message pushed was "OK, you're not getting your meds" if you don't get an allergy test. Michael and Debbie Cox pushed this directive even though providers were uncomfortable with allergy testing, as it didn't have anything to do with anything they were treating. The message was clear from Michael and Debbie Cox that if you didn't do what they said, you would be fired. Michael and Debbie Cox would just tell people face to face – they had no problem looking someone in the eye and telling them they would be fired if they didn't do as Michael and Debbie wanted. In roughly 2017, Michael and Debbie Cox told an employee that all patients had to get allergy testing. If a patient declined an allergy test, then they had to get something else done at their next appointment.

251.    Patients and employees at the Pain Institute alike did not understand why the Pain Institute chose to offer allergy testing.

252.    Providers questioned the medical necessity of the allergy testing.

253.    Employee #1 was often asked by patients why they were being tested for allergies, and the employee would have to refer the patients to their nurse practitioner because the employee did not know why the allergy testing was being conducted. It would not help with a patient's pain and "made no freaking sense." The employee understood that all patients were supposed to

53

undergo allergy testing on their first or second visit. Allergy testing was not done on every patient because some patients refused the tests.

254. Another employee called the allergy testing program "weird."

255. The Pain Institute administered allergy tests to patients at the clinics from roughly September 2016 through July 2019, generally using CPT code 95004.

256. Many of the Pain Institute's medical records contained handwritten blank sheets with the heading "Clarksville Pain Institute Alternative Pain Management." This blank form contained a list of Modalities in one column, and Dates in a second column to the left. Among the modalities listed were: Pain Cream, DME Brace, Allergy Test, Physical Therapy, Chiropractic, Weight Loss, Injections (TPI and Facet), and Radiology.

257. The reason "Allergy Testing" appears on these forms is due to the Coxes' instructions and because the Pain Institute's practice was to get as many patients to do the allergy testing as possible for money.

258. On November 17, 2017, Kathy Hartman, the National Director of Allergy Programs at Medela Remedium Solutions emailed Michael Cox, with the subject, "MRS Allergy Kit Costs." In this email, Ms. Hartman stated: "Nice talking to you on Tuesday! After we talked I went to the President of MRS and discussed your 3 locations, how we can offer you the entire MRS program and get your costs down at the same time. We normally do not advise buying in bulk and dividing between locations, but with your knowledge of allergy testing it shouldn't be a problem." The email continued to offer specific suggestions of bulk pricing that would reduce the Pain Institute's costs from roughly $67-72 per test to $57.50 per test. Michael Cox was buying allergy tests in bulk because the Pain Institute was trying to do allergy testing on most if not all of its patients.

54

259. On April 6, 2018, Stacie Broadbent Wyatt, an employee of the Pain Institute, sent herself an email with the subject heading "Documents," and enclosed an attached document entitled, "ALLERGY TESTS," displaying a list of patient names in one column and various dates in a "DATE TEST COMPLETED" column to the right. The dates of service on this list begin on July 31, 2017, and run through April 6, 2018. The email also included attachments titled, "new patient paperwork 7.2017," "braces 1.7.18," and "List of Referring Physicians." This email shows that the Pain Institute was tracking how many patients it could convince to do allergy tests.

260. Ms. Broadbent Wyatt sent herself a similar list of allergy testing recipients on May 25, 2018, and July 27, 2018.

261. By July 2018, the document included details for allergy testing like "Declined," "Only Seen Once," or "Self Pay" for certain patients in addition to dates of administration.

262. On Sunday, February 10, 2019, Ms. Broadbent Wyatt sent herself an email titled, "Monday Morning; Medical Assistant Changes." In an attachment titled, "Monday Morning 2.11," she included on a list of responsibilities for "Zach" two bullets. The first bullet stated: "Allergy intake to be included with new patient paperwork." The second bullet stated: "Allergy tests and adjunct therapies to be pushed (new patient visit, write on pain level to be transferred to their next office visit 'fill out AT ppwk'. Have patient only fill out intake. The MA's will ask the patient if they would like to have the test conducted (push this, tell them that it counts as an adjunct therapy and it will not be an additional cost to them.) [sic]"

263. On February 21, 2019, Ms. Broadbent Wyatt sent herself an email with an attachment "Josh Training List 2." That attachment contains a number of training headings related to specific issues within the practice. One of those headings is "Allergy Tests." The document notes "[c]ounts as an adjunct therapy" and "insurance patients only."

55

264.    An authentic and accurate depiction of that section is as follows:

**Allergy Tests**- Counts as an adjunct therapy

- o  Insurance patients only
- o  Fill out intake
    - o  If intake is filled out by assistant, patient must sign the bottom of the intake form.
  1. Is patient eligible for the test?
     a. Patient has to have allergy symptoms
     b. If patient has COPD; they are not eligible
     c. If patient has taken an antihistamine or a sleeping aide, test must be rescheduled. Fill out reschedule form, patient gets copy of reschedule form. Note needs to be written on pain level "DO AT" for their next visit.
     d. If patient denies allergy test or is not eligible for test, have patient sign decline form.
  2. Conduct test. Make sure patient signs both consent forms.
  3. Record results on form. Must be filled out completely.
  4. Do superbill for test.

265.    The Pain Institute was training its employees to push and perform allergy tests on everyone with insurance regardless of medical need.

266.    The same document contains a later heading titled, "Manager Duties." Some of these duties relating to allergy tests are: "Brace/Allergy Check (Spreadsheet)," and "Make sure allergy tests are being conducted."

267.    On March 26, 2019, Stacie Broadbent Wyatt sent a text message to her co-workers Debbie Cox, Melissa Moore, Krista Nicholson, and Macy Hargis.

268.    In that text message, Ms. Wyatt stated: "Great job on the allergy test today, girls! I will continue to put notes in. Once we have all of our established patients taken care of we will only have to do them on our newer patients!"

269.    Debbie Cox responded, "I know 4 of them…impressive!!!" followed by the emoji inspired by Edward Munch's noted painting, *The Scream*.

270.    An accurate and authentic depiction of that text message is as follows:

56



271.    This text message shows that the Pain Institute was conducting allergy testing on everyone and that Debbie Cox encouraged and praised that outcome. The staff were going through established patients first, and newer patients second, regardless of medical need.

272.    The Coxes' goal was to test everyone. The Coxes structured the Pain Institute's allergy program to test every patient they could who did not refuse an allergy test.

273.    Providers' orders for allergy testing were not specific to the medical needs of patients and were not based on individualized decision-making at each patient's visit.

274.    From roughly March 2019 through July 2019, Defendants sterilized *and re-used* single use plastic scratch prongs for allergy tests that had been previously used on other patients.

57

275. Towards the end of the Pain Institute's allergy testing program, the Institute still had allergy antigens in stock but was getting low on the plastic testing prongs.

276. The Pain Institute could have purchased more plastic prongs, but did not want to buy in bulk.

277. The prongs that were sterilized and reused were from Medela Remedium Solutions.

278. None of the applicators sold by Medela to the Pain Institute, including any plastic test prongs on those applicators, were intended for anything other than a single use on a single patient.

279. Defendants knew, recklessly disregarded, or were deliberately ignorant of the requirements for billing allergy tests to FHBP.

280. Defendants submitted claims to FHBP for allergy testing services that they knew were not medically necessary, not used in the treatment of FHBP beneficiaries, and/or billed pursuant to impermissible blanket orders.

281. Defendants submitted claims for payment for allergy testing to Medicare.

**E. The Psychological Testing Scheme**

282. Defendants began performing psychological assessments at the Pain Institute clinics in 2014.

283. Defendants billed for such assessments by using some of the following exemplar CPT codes: 96102, 96103, 96120, G0396, 96132, 96136, 96138, 96146, G0442, G0444, and 96127.

284. The tests were medically unnecessary because providers' orders for psychological testing were not specific to the medical needs of patients and were not based on individualized

58

decision-making at each patient's visit. The Coxes structured the Pain Institute's psychological testing program to test every patient they could.

285.     Patients would be tested when they came to the Institute on an iPad, and the results of those screenings were often never discussed with the patient.

286.     One employee, Employee #4, who worked at the Pain Institute from 2020 to 2022, assisted patients in doing the psychological tests. Employee #4 observed that during monthly visits to the Pain Institute, patients would check in at the front desk and be given a tablet to use to complete between one and three psychological tests per visit. Employee #4 estimated that most patients were tested around nine times per year. During some months, no testing was ordered, and that made the staff happy because the testing was time-consuming and the patients would sometimes put whatever answer would get the test finished faster. Employee #4 recalled that the practice maintained a monthly chart showing which psychological tests a patient was to undergo at each visit. The chart had roses on it and blocks for each month. Employee #4 estimated that between the psychological testing and UDT, forty (40) percent of patients every day would complain about how much testing they underwent each month. Employee #4 saw Michael Cox pressuring providers into ordering more tablet-based psychological testing.

287.     One employee, Employee #7, a registered nurse who worked at the Pain Institute between 2022 and 2023, recalled that when the practice started doing certain psychological tests sometime in 2023, there was a telephone call with the providers and the owner of the psychological testing company. Employee #7 recalled the calendar screenshotted below for psychological testing and stated that in certain months, certain psychological tests were performed, and in other months, the patients would receive other testing. Employee #7 raised concerns with Michael Cox that there was not a lot of follow-up or discussion about what to do with issues patients had brought to light

59

by the testing. Employee #7 raised these concerns with Michael Cox, that there should be more follow-up regarding the results of the psychological testing. Michael Cox never provided an answer, but simply told Employee #7 to see how the patient was doing after the next round of tests in the future. Employee #7 also raised concerns with Michael Cox that the practice was initially only testing patients with certain insurance and was not testing self-pay patients.

288. Employee #1 described the Pain Institute's psychological testing program as "a colossal mess," explaining that employees could not and did not keep up with the various tests that were supposed to be administered. It was chaotic trying to keep up with the schedule showing which tests to do. There was pressure from Michael Cox to order psychological tests. He would tell providers that there was a state law requiring them to order testing, though he himself was not a medical clinician.

289. Employee #5 observed that the Pain Institute did a lot of psychological testing, and it felt to Employee #5 like the tests were ordered for every patient on every visit. Patients did not like it and would complain about having to do it every visit.

290. Providers ordered psychological tests so frequently that many patients complained about having to do them at every visit.

291. One patient, Patient #1, noticed that the psychological testing routinely involved lines of questioning that were often reworded in different ways that the patient felt were repetitive in nature.

292. Providers would rarely discuss the results of the psychological testing with patients.

293. On January 31, 2022, a provider at the Pain Institute and an employee exchanged text messages regarding psychological testing. The provider texted the employee a photo of a document titled, "CPI Tablet Schedule 2022."

294. The document was a calendar for 2022 with each month of the year annotated with the specific psychological tests the Pain Institute would be running that month. For example, for February 2022, the document stated: "Psych (All)[,]" followed by "Comm" and "96138" and "G0396." Those are psychological testing CPT codes. By contrast, for November 2022, the document stated: "Psych (no Benzo)[,]" followed by "G0396."

295. The provider texted along with this photo an explanation: "So the months 96138 is written in the box is the months we're doing that specific test."

296. An accurate and authentic depiction of that text message appears below:







> So the months 96138 is written in the box is the months we're doing that specific test

> Okay

297.   Defendants knew, recklessly disregarded, or were deliberately ignorant of the requirements for billing psychological tests to FHBP.

298.   Defendants submitted claims to FHBP for psychological testing services that they knew were not medically necessary, not used in the treatment of FHBP beneficiaries, and/or billed pursuant to impermissible blanket orders.

299.   Defendants submitted, and/or caused to be submitted, claims for payment for psychological testing to Medicare.

62

**F. The Coxes and the Defendant Entities Required Patients to Submit to Testing and Pressured Providers to Carry Out the Testing Schemes**

300. The Pain Institute regularly pushed patients through the clinic like cattle, with crowded waiting rooms and perfunctory sessions with an actual provider after completing required psychological testing and UDT.

301. Patients reported undergoing UDT every time they visited the Pain Institute for any appointment.

302. One patient, Patient #2, reported undergoing UDT on almost every visit to the clinic and that it would be very random that he did not complete one. The patient thought he only needed to complete a couple of drug screens per year but completed one on about every visit just to get out of the office as quickly as possible. After the first visit, the patient never discussed the results of a urine drug screen with a provider.

303. For each visit, one patient, Patient #3, reported that vital signs and weight were taken, UDT was conducted, the patient would complete psychological testing on an iPad, and then spend roughly three minutes with a practitioner, who would ask a few questions about the patient's pain and issue a prescription. The results of the psychological tests were seldom discussed.

304. One patient, Patient #4, described being at the Pain Institute as being a "cog in the machine" with providers who wanted to get patients in and out, had "bad bedside manner[,]" and "the shittiest attitudes." The patient reported completing a UDT and psychological testing for every visit. The amount of UDT galled the patient because the patient felt it was a waste. The patient understood that to continue being a patient at the Pain Institute, the patient had to get an ineffectual pain cream at the pharmacy next door. The patient was given an allergy test too, but the results of the test were never discussed with the patient.

63

305.     Another patient, Patient #5, had to get UDT at almost every visit for five years and had to receive psychological testing frequently. The patient was unaware if the results of the psychological testing were ever used in the patient's treatment. At one point, the patient asked what the patient's score on the psychological test was, and the Pain Institute staff laughed and told the patient that the patient's score was higher than theirs when they (the staff) took the test. The patient felt that a provider at the Pain Institute seemed to try to force the patient into receiving services that the patient did not want or need. The threat seemed to be that if the patient didn't get the services, the patient would not receive medication.

306.     Another patient, Patient #6, who had to get a UDT on each of the patient's monthly visits to the Pain Institute was never told why the UDT was done, other than that it was the clinic's routine and something he was required to do. The only time the patient was told about the results of UDT, he was told that it showed he was not overusing his medication. At every visit to the Pain Institute, the patient had to answer psychological testing questions on a tablet – no one at the Pain Institute ever discussed the results of the tests with the patient. The patient also observed that for each visit to the Pain Institute, every person in the waiting room also had to complete tablet-based psychological testing and UDT.

307.     Michael and Debbie Cox pushed providers to offer certain treatments. One physician's assistant who worked for the Pain Institute between 2014 and 2017, Employee #8, pushed back and told the Coxes that those treatments were not needed or necessary. When Employee #8 did this, the Coxes did not appreciate the pushback and things got uncomfortable. Employee #8 felt that the guidance received from the Coxes prioritized profit over patient care. Employee #8 eventually left the clinic because of these disagreements. Employee #8 also felt that the allergy testing conducted by the Pain Institute didn't make sense, that it didn't make sense for

a pain clinic to test for allergies, and that if a patient had an allergy-related problem, the patient should see an allergist. As time went on, Employee #8 found that many of the ancillary services provided by the clinic seemed to be more about the profit than helping patients. Employee #8 also felt like certain services or items were pushed on patients and that the common practice was to try to sell certain services. Employee #8 observed that Michael and Debbie Cox were "obsessed" with money. Employee #8 also observed that Michael Cox would go around protocols or manipulate processes and tell the provider how to treat patients even though Michael Cox had no medical training. Employee #8 also observed Debbie Cox try to talk patients into doing treatments just for profit.

308. Another employee who primarily worked in the Springfield clinic between 2022 and 2023, Employee #7, came to the Clarksville clinic for training. From the beginning of their employment, Employee #7 was told to perform presumptive and definitive UDT of every patient every time they ordered UDT. There was never a discussion about which to order, and Employee #7 was just told that was how it was done (presumptive and definitive on the same day). Michael Cox would show up at the Springfield clinic and want to know how many patients had been seen, how much UDT was being performed, and how many procedures had been conducted. Michael Cox told Employee #7 that it was the provider's license, not his, on the line. Michael Cox would say if the patient had "X" risk, then do "this many" drug screens. For example, Michael Cox would say that if a patient was high risk, then Employee #7 should perform eight to ten urine drug screens per year plus some random drug screens. Michael Cox pressured Employee #7 to perform more UDT by comparing the provider's UDT numbers to other providers' UDT numbers, saying things like, "you only ordered 37 drug screens, but another provider ordered 89." Employee #7 observed patients coming into the practice to complain that the practice had performed more UDT than the

patient's insurance would pay for annually. Debbie Cox required Employee #7 to send her a daily update on the number of established patients, new patients, and urine drug screens that the provider had conducted that day.

### G. The Pain Institute's Billing Trends

309. The data presented below illustrate how much diagnostic testing the Pain Institute was conducting and how its billing patterns moved in tandem with the Coxes' and the Pain Institute's fraud scheme. These patterns demonstrate direction, coordination, and intent.

#### 1. General Statistics on the Pain Institute's UDT Practices

310. The Pain Institute's billing patterns indicate that the practice was almost always billing Medicare for the two highest levels of definitive UDT. For example, between 2016 and 2021, the Pain Institute never once billed Medicare for definitive UDT code G0480, the definitive drug testing code for 1-7 drug classes (lowest reimbursement level for this range of UDT codes). Between 2016 and 2022, the Pain Institute billed Medicare on average 38 times per year for UDT code G0481, the definitive drug testing code for 8-14 drug classes (second lowest reimbursement level for this range of UDT codes). Between 2016 and 2020, the Pain Institute never once billed Medicare for UDT code G0482, the definitive drug testing code for 15-21 drug classes (third lowest reimbursement level for this range of UDT codes). Between on average 2016 and 2021, the Pain Institute was almost never billing Medicare for the three lower levels of definitive UDT codes with the lowest reimbursement levels.

311. For clarity, the 2023 reimbursement rates for these codes are reproduced below:

66

| Definitive UDT Code | Definition | 2023 Medicare Reimbursement |
|---|---|---|
| G0480 | Definitive drug testing for 1-7 drug classes, including metabolites. | $114.43 |
| G0481 | Definitive drug testing for 8-14 drug classes, including metabolites. | $156.59 |
| G0482 | Definitive drug testing for 15-21 drug classes, including metabolites. | $198.74 |
| G0483 | Definitive drug testing for 22 or more drug classes, including metabolites | $246.92 |

312. By comparison, between 2016 and 2021, the Pain Institute billed Medicare on average five thousand, seven hundred ninety-seven (5,797) times *per year* for UDT code G0483, the highest level of definitive drug testing code for 22+ drug classes that pays the most.

313. Between 2016 (when the UDT codes changed to the current G048-series) and 2021, the Pain Institute was doing almost no definitive UDT on Medicare patients at the lower UDT codes, G0480, G0481, and G0482.

314. This level of UDT – all performed at the highest code possible to the exclusion of any other codes below that level for fewer numbers of drug classes – indicates that the Pain Institute was choosing the same level of care for all its Medicare patients.

315. It is highly improbable – indeed, nigh impossible – that each and every patient at the Pain Institute required the highest level of definitive UDT on each visit. And yet, the practice was almost exclusively using the highest level of definitive UDT code between 2016 and 2021.

316. As another example, between January 2, 2014, and October 31, 2023 (as an example period), approximately 67% of all visits to the Pain Institute for Medicare beneficiaries included a presumptive and a definitive UDT on the same day.

317. It is improbable that 67% of visits to the Pain Institute for Medicare beneficiaries required presumptive and definitive UDT on the same day because it is rarely medically necessary for a patient to receive both tests on the same day.

318. Between January 2, 2014, and October 31, 2023, out of all Medicare beneficiary visits for UDT to the Pain Institute, approximately 80% included billing for presumptive and definitive UDT; approximately 14% were for definitive only, and approximately 5% were presumptive only.

319. Between January 2, 2014, and October 31, 2023, 62.1% of all Medicare beneficiary visits to the Pain Institute included one of the two highest levels of UDT definitive testing, G0483 or G0482. Between January 2, 2014, and October 31, 2023, 81.6% of Medicare beneficiaries who had a definitive UDT test billed at G0483 also had a presumptive UDT test billed at 80307 on the same day. Between January 2, 2014, and October 31, 2023, 88.7% of Medicare beneficiaries who had a definitive UDT test billed at G0482 also had a presumptive UDT test billed at 80307 on the same day.

320. In 2017, six hundred forty-two (642) Medicare beneficiaries received at least one service at the Pain Institute. 61.2% of them had more than six (6) visits that year to the Pain Institute that included a G0483 along with a presumptive UDT test (80307). In 2018, eight hundred twenty-nine (829) Medicare beneficiaries received at least service at the Pain Institute. 41.0% of them had more than six (6) visits that year to the Pain Institute that included a G0483 along with a presumptive UDT test (80307). In 2019, eight hundred seventy-five (875) Medicare beneficiaries received at least one service at the Pain Institute. 46.2% of them had more than six (6) visits that year to the Pain Institute that included a G0483 along with a presumptive UDT test (80307). In 2020, seven hundred nineteen (719) Medicare beneficiaries received at least one service at the Pain

68

Institute. 60.4% of them had more than six (6) visits that year to the Pain Institute that included a G0483 along with a presumptive UDT test (80307). In 2021, six hundred forty (640) Medicare beneficiaries received at least one service at the Pain Institute. 61.9% of them had more than six (6) visits that year to the Pain Institute that included a G0483 along with a presumptive UDT test (80307).

321.    Between January 2, 2014, and October 31, 2023, and limited to Medicare beneficiary visits with at least one presumptive or one definitive UDT, volume of visits spikes at 28 days between visits. The representative chart below shows visit volume for UDT for Medicare beneficiaries:



322.    This demonstrates that Medicare beneficiaries were often coming back for UDT every 28 days. The Pain Institute's model was to test patients every 28 days regardless of medical need, with both presumptive and definitive UDT on the same day at almost every visit.

### 2. Statistics on the Pain Institute's Psychological Testing

323. The CPI Tablet Schedule chart specified which psychological tests would be performed during the calendar year 2022. This chart demonstrates that providers were not exercising their medical judgment about what patients needed on a certain day – they were following directions from the Pain Institute's chart. Medical practices cannot and should not select a "code of the month" and treat all patients the same way. The chart demonstrates that the Pain Institute's psychological testing program was not based on medical need.

324. For example, on the chart, the month of March 2022 is blank and has no codes written in. And indeed, in March 2022, the Pain Institute billed only twenty-four (24) instances of psychological testing code G0396 and zero (0) instances of psychological testing code 96138, where in the prior months of January and February of 2022, the Pain Institute had billed hundreds of those two CPT codes.

## H. A Review of a Random Sample of Medical Records Showed the Testing Was Not Medically Necessary

325. A review of a random sample of the Pain Institute's claims paid for by Medicare from 2014 through 2023 indicated that more than ninety-five (95) percent of claims reviewed were not medically necessary or reasonable and, at times, lacked necessary documentation.

326. Across UDT, allergy testing, and psychological testing services billed by the Pain Institute, when compared against actual medical records in a random sample, many of the services billed for were not supported and not billable.

### 1. UDT

327. A review of a random sample of the Pain Institute's claims paid for by Medicare from 2014 through 2023 indicated that many UDT claims were not supported by medical necessity

70

and at times also lacked necessary documentation.

328.    In the sample of reviewed medical records, there were no orders for definitive UDT until 2023. Starting in 2023, the provider signed an order for definitive UDT, but those orders were not individualized to the care of the patient or based on presumptive UDT results.

329.    In the sample of reviewed medical records, there was typically a templated physician rationale for definitive UDT that appeared across progress notes: "Definitive lab was ordered today for quantitative results that are necessary for proper treatment." This rationale does not comply with Medicare's requirements, because it does not specify the number of drugs that are necessary to test for and does not provide a rationale of what the presumptive UDT results indicated.

330.    In the sample of reviewed medical records, all patients had claims billed for the same highest number of definitive UDT panels regardless of the presumptive UDT results.

331.    In the sample of reviewed medical records, of the 561 presumptive analyzer UDT results reviewed (80307, G0431, G0479), zero (0) were supported. Of these, 500 (89.1%) were not reviewed prior to ordering definitive UDT, and 61 (10.9%) were missing documentation.

332.    The use of a consistent templated rationale for ordering definitive UDT coupled with the lack of review of presumptive analyzer UDT results across medical records indicates the presence of standing and/or blanket orders at the Pain Institute.

333.    In the sample of reviewed medical records, between 2016 and 2022, the highest level of definitive UDT (G0483) was billed 1,326 times out of a total of 1,594 definitive UDT codes ordered. In other words, 83% of the definitive UDT in the sample of reviewed medical records was for the highest possible number of drugs (G0483, 22+ drug classes). By contrast, in the sample of reviewed medical records, G0480 (1-7 drug classes) was billed one time, and G0481

71

(8-14 drug classes) was billed zero times, and G0482 (15-21 drug classes) was billed just 267 times.

334. In the sample of reviewed medical records, reflex testing was apparent because the presumptive analyzer and definitive UDT tests were billed and requested on the same date as sample collection.

335. In the sample of reviewed medical records, of the 587 definitive UDT results reviewed (G0480, G0482, and G0483), only one (1) was supported. Of these, on 497 of the claims, there was no evidence the presumptive analyzer UDT results were read (84.6%), on 37 of the claims a different and lower definitive UDT code may have been indicated (6.3%), and on 52 of the claims there were a lack of medical records to support the testing (8.8%). On the one claim that was supported, the documentation showed that the presumptive point of care dipstick was read prior to ordered definitive testing, and there was documented rationale of non-compliance by the patient.

336. In the sample of reviewed medical records, there were 1,333 claims for presumptive UDT (80307), and 1,326 claims for definitive UDT (G0483). This, together with the claims billing, indicates the practice was billing the codes together on the same date of service.

337. A standing or a blanket order is not necessarily a piece of paper that will appear in a patient's medical record at each appointment. But the presence of such orders may be inferred when across providers, across patients, and across time, the same (and highest) level of testing is ordered, and almost all that testing is medically unnecessary.

### 2. Allergy Testing

338. In the representative sample of medical records, none of the allergy tests were supported because the records for those claims lacked a physician's rationale to perform, a plan of

care for testing, interpretation of results, and interpretations of the patient being informed of the results. In short, the claims were not medically necessary or reasonable.

### 3. Psychological Testing

339. In the representative sample of medical records, approximately 90% of the psychological tests were improperly billed because they did not meet the definition of the CPT code billed, which was required for payment.

340. For example, in the sample of reviewed medical records, approximately 150 of the psychological claims were for CPT code 96136 (psychological or neuropsychological test administration and scoring by physician or other qualified health care professional, two or more tests, any method; first 30 minutes). Of those, none were supported because the medical record did not show any evidence that the physician spent at least 30 minutes with the patient, which is one of the elements needed to bill that code.

### 4. Random Sample & Medical Review Summary

341. A review of the representative sample of medical records indicated that the Pain Institute had standing orders, blanket orders, and reflex testing for UDT because the highest level of UDT was billed and was unsupported by medical necessity.

342. The records reviewed indicated that similar levels of care (i.e., the highest level of UDT, and the volume of psychological testing) were provided to patients across the board, regardless of need. The medical necessity of that care is not supported by Pain Institute's medical records.

73

### I. CMS Issued a Medicare Payment Suspension to the Pain Institute

343. The Code of Federal Regulations permits CMS to impose a payment suspension on a provider if it receives a credible allegation of fraud. The purpose of a payment suspension is to protect the government from suffering greater losses.

344. On May 13, 2024, pursuant to 42 C.F.R. § 405.371, CMS issued a suspension of all Medicare payments to the Pain Institute, which took effect on May 10, 2024 and remains in effect.

345. The payment suspension notice CMS sent the Pain Institute included five example claims that were not an exhaustive or complete list, but that served as examples to furnish an adequate notice of the basis for the suspension.

346. The dates of service for those five example claims were January 25, 2022 (claim control number 160222027573570); July 5, 2022 (claim control number 160222201038690); July 10, 2023 (claim control number 160223200038480); January 24, 2023 (claim control number 160223033377240); and November 30, 2022 (claim control number 160222348037530).

347. On May 28, 2024, the Pain Institute submitted a rebuttal statement and attached medical records, asserting that all the claims were supported and justified.

348. On July 2, 2024, CMS sent a response to the Pain Institute's rebuttal statement. CMS determined that all claims were non-payable at the time the Pain Institute billed for the services. The documentation provided for review did not support the medical necessity of the services billed by the Pain Institute. The billing codes referenced as medically unnecessary and unsupported included 80307 (UDT), G0482 (UDT), G0396 (psychological testing), and 96138 (psychological testing).

74

349. In other words, CMS determined that the services on these specific claims were not medically necessary. Specifically, CMS found that certain medical records had insufficient clinical assessment information to support the frequency of UDT, did not contain enough documentation related to what services were billed and paid, and that UDT did not appear to be random as it was performed with every office visit.

350. With regard to the Pain Institute's argument that there were not standing orders in the records, CMS specifically stated, "The absence of standing orders within the medical records does not confirm the lack of standing orders. However, medical review indicated that drug screens were performed at every visit, and the documentation provided did not support that such screens were necessary."

351. Even though the medical records did not contain an explicit standing order in writing, unnecessary UDT was done frequently enough to warrant the continuation of the suspension. This reflects that standing orders can be implemented verbally, as the Coxes did here.

352. CMS thus concluded that the suspension would remain in place.

**J. The Coxes and the Defendant Entities Received Numerous Warnings in Audits and Letters from Insurers that the Pain Institute's Testing Was Not Medically Necessary or Reimbursable**

353. Over the relevant years, the Pain Institute received many audits and letters informing the Coxes and the Pain Institute itself that their psychological testing and UDT practices were medically unnecessary, billed incorrectly, or were unsupported.

354. These audits, insurer notifications, and letters all put the Coxes and their businesses on notice that their practices were outliers and were medically unnecessary.

355. The Coxes knew they were doing too much UDT because various auditors and government-designated agents specifically and repeatedly told them so.

75

356. On August 24, 2017, the Clarksville Pain Institute general email address (clarksvillepaininstitute1849@gmail.com) sent an email attaching a comparative billing report.

357. The Comparative Billing Report is dated July 24, 2017, and is addressed to Kelly Smart, at 1849 Madison Street, Suite F, Clarksville, TN, regarding NPI 1720081532. The report explained that CMS contracts with companies like eGlobalTech to analyze billing patterns of providers compared to other providers nationwide. Kelly Smart was a provider who worked for the Coxes.

358. This report focused on UDT between January 1, 2016, and December 31, 2016.

359. The report analyzed the clinic's UDT billing.

360. Authentic and accurate depictions of that letter follow:

Table 3 provides a summary of your utilization of the procedure codes included in this CBR. The total allowed charges, allowed services, and distinct visit and distinct beneficiary counts are included for each HCPCS code. In addition an overall "Total" row is included. Your percentages and averages, denoted in Tables 4 through 7, are calculated from your utilization of the procedure codes summarized in Table 3, using the formulas that follow.

**Table 3: Summary of Your Referrals of Presumptive and Definitive Tests**
**Dates of Service: January 1, 2016 – December 31, 2016**

| HCPCS Code | Allowed Charges | Allowed Services | Visit Count | Beneficiary Count |
|---|---|---|---|---|
| G0477 | $9,986 | 672 | 672 | 228 |
| G0478 | $0 | 0 | 0 | 0 |
| G0479 | $112,218 | 1,416 | 1,416 | 350 |
| G0480 | $480 | 6 | 6 | 5 |
| G0481 | $2,829 | 23 | 23 | 8 |
| G0482 | $996 | 6 | 6 | 4 |
| G0483 | $440,145 | 2,045 | 2,045 | 386 |
| Total | $566,654 | 4,168 | 2,481 | 393 |

361. At the time, G0479 was a presumptive UDT code.

76

362. The report explained that it analyzed a provider's billings as measured against both state and national peer groups.

363. The report explained that the term "significantly higher" meant that the provider's value is higher than the peer value and the statistical testing confirmed significance.

364. Measured by different metrics, the practice's UDT billing was "significantly higher" than both state and national peers.

**Percentage of Definitive Tests using G0483**

For definitive tests, it is important for the clinician to individualize his/her ordering practice to reflect the needs of the patient. In some cases, the most costly code is chosen too often. For definitive tests, the highest cost option is G0483. The percentage of definitive tests using HCPCS code G0483 is calculated as follows:

$$\left( \frac{\text{Number of G0483 Services}}{\text{Number of Definitive Test Services}} \right) \times 100$$

Table 4 provides a statistical analysis of the percentage of definitive tests using G0483. Your percentage is compared to that of your state and the nation.

**Table 4: Percentage of Definitive Tests using G0483**
**Dates of Service: January 1, 2016 – December 31, 2016**

| Number of G0483 Services | Total Number of Definitive Test Services | Your Percent | Your State's Percent | Comparison with Your State | National Percent | Comparison with National Percent |
|---|---|---|---|---|---|---|
| 2,045 | 2,080 | 98% | 37% | Significantly Higher | 35% | Significantly Higher |

A chi-square test was used in this analysis, alpha = 0.05.

77

## Average Services per Beneficiary

The average allowed services per beneficiary was calculated for each referring provider of drug testing services to identify potential overutilization of these items. This measure considers all allowed services for the beneficiary with dates of service in 2016. The average number of services per beneficiary is calculated as follows:

$$\frac{\text{Total Number of Services}}{\text{Total Number of Beneficiaries}}$$

Table 6 provides a statistical analysis of the average services per beneficiary. Your average is compared to that of your state and the nation.

**Table 6: Average Services per Beneficiary**
**Dates of Service: January 1, 2016 – December 31, 2016**

| Total Number of Services | Total Number of Beneficiaries | Your Average | Your State's Average | Comparison with Your State | National Average | Comparison with National Average |
|---|---|---|---|---|---|---|
| 4,168 | 393 | 10.61 | 3.52 | Significantly Higher | 3.22 | Significantly Higher |

A t-test was used in this analysis, alpha = 0.05.

78

**Average Services per Visit**

The average allowed services per visit was calculated for each referring provider of drug testing services. This measure focuses on the number of actual units (or services) that were allowed on a specific date of service for a beneficiary. This measure differs from the previous measure in that it focuses on the single date of service rather than the total number of services for the entire year. The average number of services per visit is calculated as follows:

$$\frac{\text{Total Number of Services}}{\text{Total Number of Visits}}$$

Table 7 provides a statistical analysis of the average services per visit. Your average is compared to that of your state and the nation.

**Table 7: Average Services per Visit**
**Dates of Service: January 1, 2016 – December 31, 2016**

| Total Number Services | Total Number Visits | Your Average | Your State's Average | Comparison with Your State | National Average | Comparison with National Average |
|---|---|---|---|---|---|---|
| 4,168 | 2,481 | 1.68 | 1.47 | Significantly Higher | 1.48 | Significantly Higher |

A t-test was used in this analysis, alpha = 0.05.

365. The practice did not register as "significantly higher" on one metric because it had always had a policy of staggering appointments 28 days apart.

**Percentage of Services Ordered Too Frequently**

As detailed above, there are cases that limit the amount of time between tests of the same type. In some cases, the frequency of the testing does not meet established guidelines. For this measure services ordered too frequently is defined as presumptive test services performed within three days of the previous presumptive test and/or definitive test services performed within seven days of the previous definitive test. The percentage of services ordered too frequently is calculated as follows:

$$\left( \frac{\text{Number of Services Ordered Too Frequently}}{\text{Total Number of Services}} \right) \times 100$$

Table 5 provides a statistical analysis of the percentage of services ordered too frequently. Your percentage is compared to that of your state and the nation.

**Table 5: Percentage of Services Ordered Too Frequently**
**Dates of Service: January 1, 2016 – December 31, 2016**

| Services Ordered Too Frequently | Total Services | Your Percent | Your State's Percent | Comparison with Your State | National Percent | Comparison with National Percent |
|---|---|---|---|---|---|---|
| 15 | 4,168 | 0% | 1% | Does Not Exceed | 3% | Does Not Exceed |

A chi-square test was used in this analysis, alpha = 0.05.

79

366. The Comparative Billing Report of July 24, 2017 put the Pain Institute on notice that it was doing too much UDT.

367. On August 21, 2019, Humana Military on behalf of TRICARE sent the Pain Institute an education letter regarding the Pain Institute's UDT and psychological testing programs addressed to Michael Cox as CEO of the Pain Institute.

368. The August 21, 2019 Humana letter stated: "We have analyzed claims reports comparing your claims data to your peers billing urine drug screening services and found that you bill an excessive volume of the highest levels of definitive drug testing. In addition, it appears you are billing an excessive amount of testing and assessment with E&M visits."

369. The August 21, 2019 Humana letter also stated, "Please consider this a notice that all future definitive (presumptive) drug test claims must be submitted with the corresponding medical records and physician orders prior to claims payment."

370. The August 21, 2019 Humana letter outlined TRICARE's fraud prevention regulations.

371. After discussing the Pain Institute's UDT practices, the August 21, 2019 Humana letter also stated: "In addition, medical records are required for any claims billed with substance abuse assessments or psychological testing. Any claim submitted without a medical record will be denied for insufficient documentation."

372. In other words, the August 21, 2019 Humana letter stated that TRICARE would require the submission of medical records for future claims for psychological tests and UDT because prior claims to TRICARE for those same services had been unsupported.

373. On January 7, 2022, a Blue Cross Blue Shield of Tennessee auditor sent the Pain Institute the results of an audit conducted on provider billing data for providers Ashley Tinch, Catherine Bixby, Jennifer Osborne, and Meghan Anderson.

374. The January 7, 2022 Blue Cross audit requested 125 medical records. Of the 125 claims reviewed, all of them (100%) were adjusted.

375. The January 7, 2022 Blue Cross audit found that documentation did not support the billing of UDT codes 80307 and G0483 and adjusted for non-payment of twenty-one claims.

376. The January 7, 2022 Blue Cross audit found that documentation did not support the billing of psychological testing code G0396, for alcohol and/or substance misuse structured assessment, because the code requires assessment, documentation of time, and intervention. The audit adjusted sixty-five (65) claims for nonpayment on this psychological testing code.

377. The January 7, 2022 Blue Cross audit adjusted 124 claims for non-payment for CPT code 96136 (psychological or neuropsychological test administration and scoring by physician or other qualified health care professional, two or more tests, any method; first 30 minutes) because the providers were not qualified to administer and interpret the test results. In other words, the auditor was denying payment for these claims because the wrong kind of provider was conducting the tests.

378. On February 24, 2022, a Blue Cross Blue Shield of Tennessee auditor sent the Pain Institute the results of an audit conducted on provider billing data for providers Edith Dean and Pamela Montgomery.

379. The February 24, 2022 Blue Cross audit requested 128 medical records. Of the 128 claims reviewed, 127 of them (99%) were adjusted.

81

380. The February 24, 2022 Blue Cross audit found that documentation did not support the billing of UDT codes 80307 and G0483 and adjusted for non-payment of thirty-six (36) claims because the documentation did not include the reports for the testing.

381. The February 24, 2022 Blue Cross audit found that documentation did not support the billing of psychological testing code G0396, for alcohol and/or substance misuse structured assessment, because the code requires assessment, documentation of time, and intervention. The audit adjusted one hundred nineteen (119) claims for nonpayment on this psychological testing code because the testing was not supported.

382. The February 24, 2022 Blue Cross audit adjusted one hundred twenty-three (123) claims for non-payment for CPT code 96136 (psychological or neuropsychological test administration and scoring by physician or other qualified health care professional, two or more tests, any method; first 30 minutes) because the providers were not qualified to administer and interpret the test results. In other words, the auditor was denying payment for these claims because the Pain Institute provider did not have the training or experience to conduct the test.

383. On June 15, 2022, Safeguard Services, LLC, the integrity contractor for the Southeastern Unified Program Integrity Contractor ("UPIC") for CMS (for the Medicare program) sent the Pain Institute a Notice of Overpayment, informing the Pain Institute that after a medical record review, an overpayment of $16,708.38 had been identified.

384. The June 15, 2022 Safeguard letter stated that proactive data analysis indicated that the practice was performing medically unnecessary UDT.

385. The June 15, 2022 Safeguard letter stated: "Data analysis also indicated that between November 2018 and March 2019, the number of claims grew nineteen (19) times and the paid amount grew twenty-eight (28) times. In addition, between January and April 2019 the

82

number of claims increased by twenty-nine (29) percent the total in 2018. Over eighty-seven (87) percent of claims reported drug testing codes. However, between November 2018 and April 2019, the number of beneficiaries grew three (3) times, the number of claims grew twelve (12) times, and the paid amount grew twenty-six (26) times."

386. The June 15, 2022 Safeguard letter noted that the UPIC had requested medical records for eight Medicare beneficiaries from the Pain Institute.

387. The June 15, 2022 Safeguard letter stated: "Interviewed beneficiaries states that you set his/her appointment schedule every 28 days, which provides for 13 office visits per year instead of 12 (if the appointments were scheduled every 30 days), you conducts [sic] the highest level of urine drug tests at every visit and do not explain the medical necessity for the tests nor do you alter the beneficiary's medications or plan of care based upon the results of the extensive drug testing. Further, you never informed the beneficiary of the results of the drug screens."

388. The June 15, 2022 Safeguard letter informed the Pain Institute that 225 out of the 275 claim lines for the requested eight beneficiaries were denied for lack of documentation. This resulted in an 81.82% denial rate because the documentation did not support the service billed.

389. The June 15, 2022 Safeguard letter determined that an overpayment of $16,708.38 was due to Medicare.

390. The June 15, 2022 Safeguard letter put Debbie Cox and the Pain Institute on notice that their UDT practices were not medically necessary.

391. On July 11, 2022, Debbie Cox emailed the June 15, 2022 Safeguard letter to herself and to Megan Bibb. Thus, Debbie Cox was aware of the June 15, 2022 Safeguard letter.

83

392.     On May 25, 2023, a Blue Cross Blue Shield of Tennessee auditor sent the Pain Institute the results of an audit conducted on provider billing data for providers Ashley Tinch, Catherine Bixby, Jennifer Bilbrey, Joshua Holt, and Meghan Anderson.

393.     The May 25, 2023 Blue Cross audit requested fifty (50) medical records. Of the 50 claims reviewed, 44 records (88%) were adjusted.

394.     The May 25, 2023 Blue Cross audit found that documentation did not support the billing of psychological testing code G0396, for alcohol and/or substance misuse structured assessment, because the code requires assessment, documentation of time, and intervention. The audit adjusted one (1) claim for nonpayment on this psychological testing code.

395.     The May 25, 2023 Blue Cross audit found that documentation did not support the billing of UDT codes 80307 and G0483 because there were no laboratory reports and adjusted for non-payment on eight (8) claims.

396.     The May 25, 2023 Blue Cross audit found that documentation did not support the billing of psychological testing code 96138, for psychological testing, because only 15 minutes was spent on testing per the medical record. The audit adjusted six (6) claims for nonpayment on this psychological testing code.

397.     On August 23, 2023, a Blue Cross Blue Shield of Tennessee auditor sent the Pain Institute the results of an audit conducted on provider billing data for providers Edith Dean and Lorissa Dias.

398.     The August 23, 2023 Blue Cross audit requested fifty (50) medical records. Of the 50 claims reviewed, 50 records (100%) were adjusted.

399. The August 23, 2023 Blue Cross audit found that documentation did not support the billing of UDT code 80307 for presumptive UDT because there were no laboratory reports and adjusted for non-payment on forty-two (42) claims.

400. The August 23, 2023 Blue Cross audit found that documentation did not support the billing of psychological testing code G0396, for alcohol and/or substance misuse structured assessment, because the code requires assessment, documentation of time, and intervention. The audit adjusted twenty-five (25) claims for nonpayment on this psychological testing code.

401. The August 23, 2023 Blue Cross audit found that nurse practitioners were ineligible to be performing the 96138 psychological testing. The August 23, 2023 Blue Cross audit found that documentation did not support the billing of psychological testing code 96138, for psychological testing, because the wrong kind of provider was billing for the code. The audit adjusted twenty-two (22) claims for nonpayment on this psychological testing code.

402. On November 9, 2023, a Blue Cross Blue Shield of Tennessee auditor sent the Pain Institute the results of an audit conducted on provider billing data for providers Ashley Tinch, Catherine Bixby, Joshua Holt, and Meghan Anderson.

403. The November 9, 2023 Blue Cross audit requested fifty (50) medical records. Of the 50 claims reviewed, thirty-nine (39) records (78%) were adjusted.

404. The November 9, 2023 Blue Cross audit found that documentation did not support the billing of psychological testing code G0396, for alcohol and/or substance misuse structured assessment, because the code requires assessment, documentation of time, and intervention. The audit adjusted one (1) claim for nonpayment on this psychological testing code.

85

405. The November 9, 2023 Blue Cross audit found that documentation did not support the billing of UDT codes 80307 and G0482 because there were no laboratory reports and adjusted for non-payment on two (2) claims.

406. The November 9, 2023 Blue Cross audit found that nurse practitioners were ineligible to be performing the 96138 psychological testing. The November 9, 2023 Blue Cross audit found that documentation did not support the billing of psychological testing code 96138, for psychological testing, because the wrong kind of provider was billing for the code. The audit adjusted fourteen (14) claims for nonpayment on this psychological testing code.

407. All of these audits and letters put the Pain Institute and the Coxes on notice that their billing practices for UDT and psychological testing were outside the norm, were medically unnecessary, and that their medical record-keeping was insufficient.

### K. Representative Examples of False Claims

408. Because Defendants knowingly submitted FHBP claims that included services not rendered and did not comply with program requirements, the claims were false and not payable.

409. Attached to and made part of this Complaint is Exhibit A,[4] which contains a summary chart of 49 false claims (containing 180 claim lines) for seven Medicare and one VA beneficiaries in this action. The claims identified in Exhibit A are illustrative samples of the types of false claims submitted or caused to be submitted to Medicare and the VA by Defendants between February 2015 and June 2021. Exhibit A includes the names of the providers for each exemplar false claim and the location of the clinic where the test occurred.

---

[4] Exhibit A identifies the beneficiaries by letter (as they are identified herein) and omits the beneficiary names and identification numbers to protect patient privacy. The United States will serve Defendants with a copy of Exhibit A that identifies each patient by name.

410.    The following, select examples are representative of Defendants' fraudulent schemes.

A. *Beneficiary A – UDT*

    i.    Beneficiary A was a Medicare beneficiary seen for medical evaluation at the Pain Institute on November 18, 2015. According to patient records, Beneficiary A had been an established patient at the Pain Institute since September 2015.

    ii.   The progress note for Beneficiary A's October 21, 2015, date of service states: "POC WNL for meds prescribed but definitive lab was ordered today for quantitative results that are necessary for proper treatment. UDS from last office visit discussed WNL for meds prescribed[.]"[5]

    iii.  Many of the patient's other progress notes, for example one dated March 10, 2016, contain the statement: "This patient is a chronic pain patient that is using opiates/opioids and or [sic] on other schedule 2 and 3 medications. Because of the risk of abuse with other prescribed medications of the same nature not prescribed by this clinic and illicit drugs of abuse I am ordering this drug test out of medical necessity for this patient's safety and efficacy and to prevent to the best of my ability this patient to abuse any prescribed or illicit / illegal drugs."

    iv.   This is word-for-word the same canned language Michael Cox received in an email on September 1, 2015, quoted above, with the subject heading, "medical necessity for UDT's for chronic pain patients."

    v.    The records reflect that Defendants were cutting and pasting patient notes in the

---

[5] Upon information and belief, "wnl" is an abbreviation that means, "within normal limits."

87

records for Beneficiary A.

vi. Billing records for that date of service, November 18, 2015, indicate a preliminary screen was conducted followed by a confirmatory test for 14 drug classes.

vii. Medicare paid the Pain Institute roughly $167.05 for the preliminary screens and roughly $512.08 for the confirmatory testing for this one date of service, which occurred less than a month after the presumptive and definitive testing ordered on October 21, 2015.

viii. The progress note for November 18, 2015, states, "WNL [within normal limits] for meds prescribed, but definitive lab was ordered today for quantitative results that are necessary for proper treatment."

ix. The progress note also states: "UDS from last office visit discussed: WNL for meds prescribed."

x. This progress note also states "[w]e will continue with UDS at all appts."

xi. This is identical language to the October 21, 2015, date of service notes.

xii. On or about November 25, 2015, Medicare paid the Pain Institute for various CPT codes of UDT in the amount of $679.13, which as Defendants well knew, was not reimbursable because it was not medically necessary, not used in the treatment of the beneficiary, or billed pursuant to impermissible blanket/standing/reflex orders.

xiii. This patient's care presents a pattern of blanket orders and reflex testing. The patient was seen monthly with presumptive and definitive UDT being conducted at each visit. The presumptive UDT results were not being used to individualize the treatment plan. There was no medical reason to perform the highest level of

88

definitive testing. Identical, canned language is used in the medical record for each visit and does not specify which definitive UDT panels were necessary. The provider was not individualizing a treatment plan when results continued to show the patient was compliant and taking medication as prescribed.

B. ***Beneficiary B – UDT and Psychological Testing***

i. Beneficiary B was a Medicare beneficiary seen for medical evaluation at the Pain Institute throughout 2019 and 2020. According to billing data, Beneficiary B had been an established patient with the Pain Institute since September 2019.

ii. On September 11, 2019, September 25, 2019, October 23, 2019, November 20, 2019, January 20, 2020, March 16, 2020, April 13, 2020, and May 11, 2020, the Pain Institute billed Medicare for CPT Codes 80307 and G0483 on the same date of service for this beneficiary. Medicare paid the Pain Institute at least $241.98 for each G0483 claim and at least $60.90 for each 80307 claim – roughly $2,439.06 for this series of claims – which as Defendants well knew, was not reimbursable because the UDT services were not medically necessary, not used in the treatment of the beneficiary, or billed pursuant to impermissible blanket orders.

iii. Beginning in 2019, the Pain Institute billed Medicare for CPT code 96136 (psychological test administration, 30 minutes, two or more tests) monthly for performing PMQ-R and COMM computerized psychological testing.

iv. On February 17, 2020, the beneficiary answered various questions for a psychological test called COMM for aberrant behavior. The progress note for that date of service was signed by Meghan Anderson. The same progress note states,

89

"Per the Tennessee State Requirements and Tracy Alcott, General Sessions Attorney, we will perform psychological testing at every visit for a patient on benzodiazepine therapy and every other visit for all other patients to screen for risk of depression and misuse of opioid therapy." The same progress note states, "Risk Assessment: High risk- behavioral- for potential medication misuse or abuse due COMM score of 11 on 2/17/2020, we will continue with definitive UDS at least six time per year[.]"

v. Psychological testing in April and May of 2020 showed lower risk scores. Yet the provider did not scale back the frequency of psychological screenings in the care plan.

vi. On April 13, 2020, the Pain Institute billed Medicare for CPT code 96136, and Medicare paid $29.77 for psychological testing, which as Defendants well knew, was not reimbursable because the billed psychological testing services were not medically necessary, not used in the treatment of the beneficiary, or billed pursuant to impermissible blanket orders.

vii. This patient's care presents a pattern of blanket orders and reflex testing. The patient was seen monthly with presumptive and definitive UDT being conducted at each visit. The presumptive UDT results were not being used to individualize the treatment plan. There was no medical reason to perform the highest level of definitive testing. Identical, canned language is used in the medical record for each visit and does not specify which definitive UDT panels were necessary. Monthly psychological testing was not supported because it did not meet the definition of the CPT code – the progress notes show that only 15 minutes were

90

spent one the entire visit rather than the required 30 minutes for that psychological testing CPT code. The results were not being used to help the provider adjust the treatment plan based on assessed risk level.

## C. *Beneficiary C – Allergy Testing*

i.   Beneficiary C was a Medicare beneficiary seen for medical evaluation at the Pain Institute in 2016 and 2017. According to billing data, Beneficiary C had been an established patient with the Pain Institute since May 2016.

ii.  On October 30, 2017, the Pain Institute billed Medicare for the CPT code 95004 for allergy testing, with a diagnosis of allergic rhinitis.

iii. The Chief Complaint was recorded as, "Med 13 (Y) – ONLY ALLERGY TEST PERFORMED THIS DOS."

iv.  There is no diagnosis or reason documented for conducting the allergy test. The note for this date of service, and subsequent visit notes, do not include any test report or interpretation. Neither the symptoms of a runny nose nor the diagnosis of rhinitis on the claim is found on the October 30, 2017 visit note.

v.   On October 30, 2017, the Pain Institute billed Medicare for CPT code 95004 and Medicare paid $290.00 for allergy testing, which as Defendants well knew, was not medically necessary, not used in the treatment of the beneficiary, or billed pursuant to impermissible blanket orders.

vi.  The allergy testing was not medically necessary because no reason for the test (signs/symptoms) was documented in the medical record. There was no interpretation of the results and the testing was not used to individualize treatment. The medical record does not support a diagnosis of allergic rhinitis.

91

### D. *Beneficiary D – UDT*

i. Beneficiary D was a Medicare beneficiary seen for medical evaluation at the Pain Institute in 2019 and 2020. According to patient records, Beneficiary D had been an established patient with the Pain Institute since June 2017.

ii. The Pain Institute billed G0483 for this beneficiary on June 5, 2019, July 3, 2019, July 31, 2019, and August 28, 2019, among other dates. On the June 5, 2019, July 3, 2019, and July 31, 2019 dates of service, the Pain Institute billed G0483. On the August 28, 2019 date of service, the Pain Institute billed G0483 and 80307.

iii. The beneficiary's UDT results were not always reviewed by the Pain institute.

iv. On September 25, 2019, the Pain Institute billed Medicare for CPT Code 80305 for presumptive UDT and was paid $12.35 for that service.

v. The September 25, 2019 presumptive UDT result showed that the patient was positive for benzodiazepines.

vi. The September 25, 2019 note states: "Urine drug screen completed today; POC[.]"

vii. The same note states: "Benzo Use: None."

viii. No definitive or confirmatory UDT was ordered on September 25, 2019.

ix. The note from the patient's next visit, October 23, 2019, also states: "Benzo Use: None[,]" and also states, "POC: (9/25/19) Positive Opi[.]"

x. In other words, when this beneficiary tested positive on a presumptive test for a medication the beneficiary was not prescribed, no definitive test was ordered.

xi. This reflects that the Pain Institute was billing for UDT and was not even looking at the results to inform decisions on how much UDT to order and when.

92

xii. Medicare paid the Pain Institute at least $241.98 for each G0483 claim, at least $63.36 for each 80307 claim, and at least $12.35 for each 80305 claim – roughly $1,055.98 for this series of claims, which as Defendants well knew, were not reimbursable because the billed services were not medically necessary, not used in the treatment of the beneficiary, or billed pursuant to impermissible blanket orders.

xiii. In addition to a pattern of blanket orders and reflex testing, the positive benzodiazepine result in this patient's record is inconsistent with the treatment plan. The provider's incorrect review of the results shows the provider was not looking at the results of the UDT to make informed decisions about what to order and how often.

E. *Beneficiary E – UDT*

i. Beneficiary E was a Medicare beneficiary seen for medical evaluation at the Pain Institute in 2019, 2020, and 2021. According to billing data, Beneficiary E had been an established patient with the Pain Institute since at least July 2019.

ii. On July 25, 2019, August 7, 2019, October 2, 2019, October 30, 2019, November 27, 2019, December 19, 2019, January 22, 2020, March 2, 2020, March 30, 2020, April 27, 2020, June 1, 2020, July 27, 2020, August 24, 2020, September 21, 2020, October 19, 2020, November 10, 2020, December 14, 2020, January 11, 2021, March 8, 2021, April 12, 2021, May 10, 2021, and June 9, 2021, the Pain Institute billed Medicare for CPT Codes 80307 and G0483 on the same date of service for this beneficiary.

iii. This timeline indicates that the patient was receiving significant amounts of UDT

93

roughly every 28 days.

iv. On July 23, 2019, the beneficiary signed a document titled, "Three Strike Policy," which, among other things, stated: "This practice has a 3 strike policy regarding narcotic medications. This means that you can be DISCHARGED on the 3rd strike."

v. On September 21, 2020, the beneficiary signed a document titled, "Narcotic Medication Pain Agreement," which, among other things, included an agreement not to use illegal drugs while on prescriptions from the Pain Institute.

vi. The beneficiary's March 2, 2020, UDT was negative for hydrocodone, which PIN had prescribed for Beneficiary E.

vii. The encounter note for the patient's March 30, 2020 visit to the Pain Institute stated that the March 2, 2020 UDT screening was inconsistent with prescribed medication, but no written warning was issued. The note states, "UDS from last office visit: 3/2/20 – h/c [hydrocodone] without mets [metabolic equivalents], +o/c with mets; inconsistent but late."

viii. The beneficiary received a written warning on May 19, 2020, for testing positive for fentanyl on April 27, 2020.

ix. The beneficiary received a written warning on June 29, 2020, for a negative drug screening for prescribed hydrocodone.

x. The beneficiary received a written warning on February 8, 2021 for absence of prescribed oxycodone.

xi. The beneficiary was not discharged despite three written warnings from the Pain Institute.

94

xii. The beneficiary received a verbal warning on June 8, 2021.

xiii. Medicare paid the Pain Institute at least $241.98 for each G0483 claim and at least $60.90 for each 80307 claim – roughly $6,752.28 for this series of claims, which as Defendants well knew, was not reimbursable because the billed services were not medically necessary, not used in the treatment of the beneficiary, or billed pursuant to impermissible blanket orders.

xiv. In addition to a pattern of blanket orders and reflex testing, this patient's care reflects that the practice did not discharge this patient despite three written warnings and UDT reports that did not match the prescribed medications. The patient continued to be seen approximately every 28 days, the treatment plan was never updated to reflect UDT results, and continued to receive opioids despite clear evidence that the patient was not taking them as prescribed.

### F. Beneficiary F – UDT and Psychological Testing

i. Beneficiary F was a Medicare beneficiary seen for medical evaluation at the Pain Institute in 2018 and 2019. According to billing data, Beneficiary F had been an established patient with the Pain Institute since February 2018. This beneficiary was referred from a different provider in Clarksville for achilles tendinitis.

ii. On February 14, 2018, February 28, 2018, March 28, 2018, April 25, 2018, May 23, 2018, June 20, 2018, March 27, 2019, and April 24, 2019, the Pain Institute billed Medicare for CPT Codes 80307 and G0483 on the same date of service for this beneficiary. Medicare paid the Pain Institute at least $241.98 for each G0483 claim and at least $63.36 for each 80307 claim – roughly $2,484.90 for this series of claims.

iii. On the patient's initial visit, on February 14, 2018, Beneficiary F's presumptive UDT was negative, but the Pain Institute still ordered a 22-drug class definitive screening for Beneficiary F. The note from that encounter date states: "POC" _2/14/18 all neg_; Definitive lab was ordered today for quantitative results that are necessary for proper treatment[.]"

iv. Also in the initial visit note, the patient was classified as "[h]igh risk due to new patient status. UDS will be performed for the next three months w/ reassessment of risk at the end of three months."

v. The initial visit note also states: "Definitive drug screen is required to confirm the presence of medication metabolites and to obtain an accurate measurement of the amount of medication and metabolites in the patient's urine. Obtaining this information is imperative in the treatment of this patient to ensure that the medication is being taken as prescribed, detect any possible medication diversion, and ensure the urine is not altered."

vi. The encounter note for the beneficiary's June 20, 2018 visit contains the same boilerplate language about risk assessment ("[h]igh risk due to new patient status") and definitive drug screen.

vii. The encounter note for the beneficiary's February 27, 2019 visit classified the beneficiary as "[l]ow risk due to MED level. Will perform UDS 4 times a year Nov, March, June, and Aug and PRN per provider discretion." This note contains the same definitive drug screen boilerplate language.

viii. The encounter note for March 27, 2019 has the same schedule for UDT.

ix. The encounter note for April 24, 2019 has the same schedule for UDT.

96

x. The encounter note for May 22, 2019 has the same schedule for UDT.

xi. Even when this beneficiary was indicated in the medical record by providers for a lower level of UDT scheduled for November, March, June, and August, this beneficiary received a presumptive and a definitive test on April 24, 2019.

xii. Monthly psychological testing was performed even though the patient scored in the low-risk range.

xiii. On February 14, 2018, February 28, 2018, March 28, 2018, May 23, 2018, June 20, 2018, the Pain Institute billed Medicare for CPT code 96103 (computer administered psychologic assessment overseen by qualified healthcare provider) for this beneficiary, resulting in a $17.01 payment each time.

xiv. On February 14, 2018, February 28, 2018, March 28, 2018, May 23, 2018, June 20, 2018, the Pain Institute billed Medicare for CPT code 96120 (neuropsychological testing) for this beneficiary, resulting in a $28.93 payment each time.

xv. On March 27, 2019 and April 24, 2019, the Pain Institute billed Medicare for CPT code 96136 for this beneficiary, resulting in a $29.81 payment each time.

xvi. As Defendants well knew, the above services were not reimbursable, because they were not medically necessary, not used in the treatment of the beneficiary, or billed pursuant to impermissible blanket orders.

xvii. This patient's care presents a pattern of blanket orders and reflex testing. The patient was seen monthly with presumptive and definitive UDT being conducted at each visit. The provider was not altering the treatment plan based on changing levels of risk, using copied and pasted language month to month on progress

97

notes, and ordering a medically unnecessary amount of UDT.

xviii. The monthly psychological testing was medically unnecessary, did not meet the requirements of the CPT code, and the results were not used to influence patient treatment.

## G. *Beneficiary G – UDT*

i. Beneficiary G was a VA beneficiary seen for medical evaluation at the Pain Institute in 2015.

ii. VA records reflect that this beneficiary was seen at the Pain Institute on the following dates of service: February 2, 2015, February 17, 2015, February 26, 2015, March 3, 2015, March 26, 2015, April 2, 2015, April 23, 2015, May 21, 2015, June 22, 2015, and June 23, 2015.

iii. For the visits on February 2, 2015, February 17, 2015, and February 26, 2015, the Pain Institute billed the VA for the following codes for presumptive and definitive urine drug screening: 80304, 80321, 80323, 80325, 80345, 80347, 80348, 80349, 80353, 80354, 80355, 80356, 80358, 80361, 80362, 80365, 80366, 80367, 80369, 80372, 80373, 81003, 82570, 83992, and 83986.

iv. The February 17, 2015 date of service note states: "UDS today: analyzer, lab done today." It also states: "UDS from last office visit discussed: wnl for med prescribed" and "UDS inconsistency discussed and/or signed: na first visit[.]"

v. The February 26, 2015 date of service note states: "UDS today: analyzer, lab done today[.]" It also states: "UDS from last office visit discussed: wnl for med prescribed" and "UDS inconsistency discussed and/or signed: na first visit[.]"

vi. For those codes, the VA paid the Pain Institute $1,058.72 for the February 17,

98

2015, date of service and $1,058.72 for the February 26, 2015, date of service, but as Defendants well knew, these services were not reimbursable, because they were not medically necessary, not used in the treatment of the beneficiary, or billed pursuant to impermissible blanket orders.

vii. This patient's care presents a pattern of blanket orders and reflex testing. The patient was seen monthly with presumptive and definitive UDT being conducted at each visit. The presumptive UDT results were not being used to individualize the treatment plan. There was no medical reason to perform the highest level of definitive testing.

## **FIRST CLAIM FOR RELIEF**

### **Violations of the FCA: Presenting False Claims for Payment**
### **(31 U.S.C. § 3729(a)(1)(A))**

411. The United States realleges and incorporates by reference each of the preceding paragraphs.

412. As detailed above, from at least April 2014 through May 2024, Defendants knowingly, or with reckless disregard, presented, or caused to be presented, materially false and fraudulent claims for payment or approval to the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, (a) for UDT, (b) psychological tests, and (c) allergy tests, when those claims were not payable because they were for services not rendered, not medically necessary, including being billed pursuant to impermissible blanket orders and not being ordered by the treating practitioner, and/or being not used in the treatment of FHBP beneficiaries.

99

413. Because of the Defendants' acts, the United States suffered damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $13,946 and not more than $27,894 per for each violation.

## SECOND CLAIM FOR RELIEF

### Violations of the FCA: Use of False Statements
### (31 U.S.C. § 3729(a)(1)(B))

414. The United States realleges and incorporates by reference each of the preceding paragraphs.

415. As detailed above, from at least April 2014 through May 2024, Defendants knowingly, or with reckless disregard, made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), including the false statements, certifications and representations on claim forms, the EDI, and multiple Medicare 855B forms, to obtain approval for and payment by the United States for false or fraudulent claims as detailed above in violation of Section 3729(a)(1)(B) of the FCA.

416. Defendants knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), including miscoding, or causing the miscoding, of claims for Medicare Part B services and VA services with the CPT codes G0431, G0434, G0479, 80305, 80306, 80307, G0480, G0481, G0482, G0483, 96102, 96103, 96120, G0396, 96132, 96136, 96138, 96146, G0442, G0444, 96127, 95004 and including false statements in the supporting documentation for those claims in the beneficiaries' patient files.

100

417. Because of the Defendants' acts, the United States suffered damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $13,946 and not more than $27,894 per for each violation.

## THIRD CLAIM FOR RELIEF

### Payment by Mistake
### (Federal Common Law)

418. The United States realleges and incorporates by reference each of the preceding paragraphs.

419. As detailed above, from at least April 2014 through May 2024, the United States paid Defendants, either directly or indirectly, for claims submitted by Defendants for services that were for services not rendered, not medically necessary, including being billed pursuant to impermissible blanket orders and not being ordered by the treating practitioner, and/or being not used in the treatment of FHBP beneficiaries, without knowledge of material facts, and under the mistaken belief that Defendants were entitled to receive payment for such claims.

420. The United States paid more money to Defendants than it would have based on the erroneous belief that Defendants were entitled to reimbursement and without knowing that Defendants submitted claims for Medicare Part B services that were either not covered or payable only at a lower level of reimbursement. The United States, acting in reasonable reliance that the Defendants' claims were accurate, complete, and truthful, paid Defendants certain sums of money to which they were not entitled, and thus Defendants are thus liable to account and pay to the United States such amounts, which are to be determined at trial.

101

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Federal Common Law)

421.    The United States realleges and incorporates by reference each of the preceding paragraphs.

422.    As detailed above, from at least April 2014 through May 2024, the United States claims the recovery of all FHBP monies by which Defendants have been unjustly enriched, including profits earned by Defendants from non-reimbursable UDT, psychological tests, and allergy tests that was paid based on claims for services that were for services not rendered, not medically necessary, including being billed pursuant to impermissible blanket orders and not being ordered by the treating practitioner, and/or being not used in the treatment of FHBP beneficiaries.

423.    By obtaining government funds to which they were not entitled, Defendants were unjustly enriched at the expense of the United States in an amount to be determined and which, under the circumstances, in equity and good conscience, should be returned to the United States.

## PRAYER FOR RELIEF

Wherefore, the United States respectfully requests judgment be entered in its favor and against Defendants jointly and severally as follows:

a.  On Claims for Relief One and Two (FCA), treble damages and civil penalties in the maximum amount allowed by law;

b.  On Claims for Relief Three and Four (Federal Common Law), damages to the extent allowed by law, including damages, interest, costs, and expenses; and

c.  For all other relief the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 7.03(b), the United States demands a trial by jury on all issues so triable.

Respectfully submitted,

For the United States:

ROBERT E. MCGUIRE
Acting Untied States Attorney

By:   s/ Michael Tackeff
MICHAEL C. TACKEFF, B.P.R. #036953
Assistant United States Attorney
719 Church Street, Suite 3300
Nashville, TN 37203
Email: Michael.Tackeff@usdoj.gov

103