UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KRISTA NICHOLSON,<br><br>                    Plaintiff,<br><br>         v.<br><br>CLARKSVILLE PAIN INSTITUTE, LLC, *et al.*,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)    Civil Action No.  3:20-cv-00309<br>)    Judge Aleta A. Trauger<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF CLARKSVILLE PAIN INSTITUTE, LLC's AND PAIN INSTITUTE OF NASHVILLE, PLC'S MOTION TO DISMISS <u>UNITED STATES' AMENDED COMPLAINT-IN-INTERVENTION</u>**

BASS, BERRY & SIMS PLC
Matthew M. Curley (TN Bar No. 018163)
Brian F. Irving (TN Bar No. 033945)
Hannah E. Webber (TN Bar No. 036244)
21 Platform Way South, Suite 3500
Nashville, TN 37203
(615) 742-6200
mcurley@bassberry.com
birving@bassberry.com
hannah.webber@bassberry.com

*Attorneys for Defendants Clarksville Pain Institute, LLC and Pain Institute of Nashville, PLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.   Procedural History................................................................................................. 2

    II.  The United States' Allegations.............................................................................. 3

STANDARD OF REVIEW .................................................................................................. 6

ARGUMENT........................................................................................................................ 7

    I.   The Amended Complaint Fails to Plead the FCA Claims...................................... 7

        A.   The Amended Complaint Fails to Plead the Details of Each Fraud Scheme with Particularity................................................................................................. 8

            1.    The Amended Complaint fails to plead the details of any fraud scheme to order and bill for medically unnecessary UDTs resulting from standing or blanket orders. ............... 8

            2.    The Amended Complaint fails to plead the details of any fraud scheme to order and bill for medically unnecessary UDTs as a result of reflex testing. ................................... 16

            3.    The Amended Complaint fails to plead the details of any fraud scheme to order and bill for medically unnecessary allergy tests. .................................................................... 17

            4.    The Amended Complaint fails to plead the details of any scheme to order and bill for medically unnecessary psychological testing........................................................... 19

        B.   The Amended Complaint Fails to Plead CPI and PIN's Acted with the Requisite Intent. ................................................................................................................. 22

    II.  The Common Law Claims Should Be Dismissed. ............................................... 24

    III. The Amended Complaint Should Be Dismissed with Prejudice......................... 24

CONCLUSION................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Aetna Life Ins. Co. v. Maximum Medical & Rehab., LLC,*
2025 WL 1193782 (D.N.J. Apr. 23, 2025) ..................................................................15

*U.S. ex rel. Alt v. Anesthesia Servs. Assocs., PLLC,*
2019 WL 7372511 (M.D. Tenn. Dec. 31, 2019)...................................................12, 24

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)......................................................................................................7

*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
342 F.3d 634 (6th Cir. 2003) .....................................................................................24

*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
501 F.3d 493 (6th Cir. 2007) .......................................................................................7

*U.S. ex rel. Brooks v. Trillium Cmty. Health Plan, Inc.,*
2017 WL 2805863 (D. Or. June 28, 2017) ................................................................15

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.,*
2014 WL 4375638 (E.D. Pa. Sep. 4, 2014) ...................................................14, 19, 21

*U.S. ex rel. Dennis v. Health Mgmt. Assocs., Inc.,*
2013 WL 146048 (M.D. Tenn. Jan. 14, 2013).............................................................23

*U.S. ex rel. Gale v. Raytheon Co.,*
2009 WL 3378976 (S.D. Cal. Oct. 19, 2009) .....................................................10, 22

*U.S. ex rel. Gordon v. Shiel Med. Lab'y,*
2025 WL 949432 (E.D.N.Y. Mar. 29, 2025)...................................................... 18, 23

*U.S. ex rel. Ibanez v. Bristol-Myers Squibb Co.,*
874 F.3d 905 (6th Cir. 2017) .....................................................................................25

*U.S. ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health,*
816 F. App'x 892, 897-98 (5th Cir. 2020) .................................................................12

*U.S. ex rel. Jensen v. Genesis Lab'y,*
2025 WL 3763951 (D.N.J. Dec. 30, 2025).........................................................18, 20

*U.S. ex rel. Jensen v. Genesis Lab'y,*
2025 WL 615480 (D.N.J. Feb. 26, 2025) ............................................................11, 19

*U.S. ex rel. Johnson v. Bethany Hospice & Palliative Care, LLC,*
   2020 WL 1542339, at *11 (S.D. Ga. Mar. 31, 2020), *aff'd sub nom. Est. of
   Helmly v. Bethany Hospice & Palliative Care of Coastal Georgia, LLC*, 853
   F. App'x 496 (11th Cir. 2021)........................................................................................13

*In re Keithley Instruments, Inc. Sec. Litig.*,
   268 F. Supp. 2d 887 (N.D. Ohio 2002)...............................................................10, 22

*U.S. ex rel. Kietzman v. Bethany Circle of King's Daughters of Madison, Indiana,
   Inc.*,
   305 F. Supp. 3d 964 (S.D. Ind. 2018)..................................................................19, 22

*U.S. ex rel. Kramer v. Doyle*,
   2022 WL 1186182 (S.D. Ohio Apr. 21, 2022) ...........................................................7

*U.S. ex rel. Ladas v. Exelis, Inc.*,
   824 F.3d 16 (2d Cir. 2016)..........................................................................................25

*U.S. ex rel. Lawson v. Aegis Therapies, Inc.*,
   2015 WL 1541491 (S.D. Ga. Mar. 31, 2015) ............................................................24

*Leading Edge Distrib., Ltd. v. All-State Diversified Prods., Inc.*,
   2012 WL 13026944 (N.D. Ohio May 15, 2012)..........................................................25

*U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*,
   525 F.3d 439 (6th Cir. 2008) ........................................................................................6

*U.S. ex rel. McFarland v. Fla. Pharmacy Sols.*,
   358 F. Supp. 3d 1316 (M.D. Fla. 2017).................................................................18, 22

*U.S. ex rel. McKoy v. Atlanta Primary Care Peachtree, PC*,
   2025 WL 1823269 (11th Cir. July 2, 2025)....................................................17, 19, 21

*U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*,
   836 F.3d 770 (7th Cir. 2016) .................................................................................11, 22

*U.S. ex rel. Richardson v. Lexington Foot & Ankle Ctr. PSC*,
   2018 WL 2709320 (E.D. Ky. June 5, 2018) ...............................................................10

*Sanderson v. HCA-The Healthcare Co.*,
   447 F.3d 873 (6th Cir. 2006) ....................................................................................7, 8

*U.S. ex rel. Senters v. Quest Diagnostics, Inc.*,
   2024 WL 4297469, at *5-6 (N.D. Ga. Aug. 23, 2024) ..............................................12

*U.S. ex rel. Shannon v. BHG Holdings, LLC*,
   2025 WL 958226 (D.D.C. Mar. 31, 2025)...................................................................11

iv

*U.S. ex rel. Sharma v. Miraca Life Scis., Inc.*,
472 F. Supp. 3d 429 (N.D. Ohio 2020)........................................................................25

*United States v. Quicken Loans, Inc.*,
2017 WL 930039 (E.D. Mich. Mar. 9, 2017) ...............................................................22

*United States v. Walgreen Co.*,
591 F. Supp. 3d 297 (E.D. Tenn. 2022) .......................................................................22

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
579 U.S. 176 (2016)..................................................................................................7, 22

*U.S. ex rel. Winnon v. Lozano*,
2023 WL 6065162, at \*6 (D.D.C. Sep. 18, 2023) .......................................................13

**Statutes**

Tenn. Code Ann. § 53-11-308(g)....................................................................................5

**Other Authorities**

42 C.F.R. § 405.371(a)(2)..............................................................................................15

Fed. R. Civ. P. 9(b) .........................................................................................................7

*Issuance and Use of Guidance Documents by the Department of Justice* (July 1,
2021), https://www.justice.gov/d9/2022-12/attorney_general_memorandum_-
_issuance_and_use_of_guidance_documents_by_the_doj712021.pdf .......................5

LCD L35724, *Urine Drug Testing*, https://www.cms.gov/medicare-coverage-
database/view/lcd.aspx?lcdid=35724.........................................................................4, 5

*Reinstating the Prohibition on Improper Guidance Documents*. (Feb. 5, 2025),
https://www.justice.gov/ag/media/1388511 .................................................................5

Defendants Clarksville Pain Institute, LLC ("CPI") and Pain Institute of Nashville, PLC ("PIN") respectfully submit this Memorandum of Law in support of their Motion to Dismiss the Amended Complaint-In-Intervention. (Dkt. 110 ("Am. Compl.").)

## PRELIMINARY STATEMENT

The Court dismissed the initial Complaint-In-Intervention (Dkt. 65 ("Compl.")) in this False Claims Act ("FCA") lawsuit because the United States "simply d[id] not allege with sufficient particularity the who, what, when, where or how of the alleged schemes, nor d[id] it allege any causal connection between the adoption and implementation of these schemes by the entity defendants and the submission of false claims by the individual providers." (Dkt. 89 ("Court's Mem.") at 45.) Indeed, the Court emphasized that the initial Complaint was "sorely lacking" in "specific facts indicating the existence of actual schemes to defraud and the knowing involvement of individuals acting on behalf of the entities in directing employees of the entity to submit false or fraudulent claims." (*Id.* at 38.)

The Amended Complaint is no different. The United States continues to "rel[y] on conclusory assertions" (*id.*), asking the Court to infer fraud from generalized allegations lacking in context for each of the four distinct alleged schemes, which accuse CPI and PIN of causing clinicians to order medically unnecessary urine drug tests ("UDTs"), allergy tests and psychological tests for patients receiving chronic opioid therapy and then fraudulently billing for those services. Where the Amended Complaint does provide additional "details," they are extraneous at best. The following non-exhaustive examples illustrate these continued deficiencies:

- The Amended Complaint again purports to allege the existence of standing or blanket orders for UDT through conclusory allegations without ever identifying with particularly any actual blanket or standing order that was issued. (*E.g.,* Am. Compl. ¶¶ 177–82.). In fact, new allegations and screenshots reveal that providers were expected to exercise their clinical discretion in ordering UDT. (*Id.* ¶¶ 195, 220, 227.)
- It adds nonspecific and/or irrelevant allegations about patients' and employees' beliefs and opinions about UDT (*e.g., id.* ¶¶ 155, 176, 195, 302–05, 190, 198, 221), allergy testing (*id.*

¶¶ 251–54), and psychological testing (*id.* ¶¶ 289–91).

- Attempting to bolster allegations relying on payor audits and education, it adds allegations about a "Comparative Billing Report" about utilization and billing rates for unidentified UDT in 2016 (*id.* ¶¶ 356–66) and psychological testing (*id.* ¶¶ 376, 396, 380–81, 394, 400, 404).

- It adds to the statistical sampling allegations the Court previously rejected, but the additional details do not make the necessary connection to the various alleged fraudulent schemes or claims arising therefrom. (*Id.* ¶¶ 309–20, 333, 325–37, 315–17, 321–22, 334–36, 339–40.)

- It adds extraneous facts, such as regarding the payment suspension that came *after* this lawsuit was filed (*id.* ¶¶ 343–51), normal business practices (*id.* ¶¶ 259–65) and inflammatory but irrelevant allegations (*id.* ¶¶ 273–78).

- It adds new commentary about the example patients relied on in the initial Complaint (*id.* ¶¶ 408–10) but does not add necessary details showing how those examples arose from any of the alleged fraudulent schemes.

- As to psychological testing, it barely even attempts to bolster the initial allegations, and those it does add are only more conclusory and implausible assertions regarding lack of individualized decision-making. (*E.g., id.* ¶¶ 284, 293–96, 323–24.)

None of the new details in the Amended Complaint explains how any particular claim for these services submitted to the government was medically unnecessary without relying on impermissibly broad assumptions and conclusory assertions. The Amended Complaint also fails to show that CPI or PIN acted with the requisite intent to violate the FCA. Finally, the United States previously conceded that its common-law claims fall with its FCA claims. For these reasons, the Amended Complaint should be dismissed with prejudice.

## BACKGROUND

### I. Procedural History

Relator Krista Nicholson filed her *qui tam* complaint under seal on April 10, 2020. (Dkt. 1.) The *qui tam* complaint alleged numerous fraud schemes and FCA violations, including the submission of false claims for medically unnecessary UDTs, allergy tests, psychological tests, prescriptions for compounded medications and other adjunct therapies. It also alleged violations of the Anti-Kickback Statute and the Stark law.

More than four years later, the United States elected to intervene with respect to allegations

concerning the medical necessity of UDTs, allergy tests and psychological tests for CPI's and PIN's patients.  (Dkt. 60.)  It declined to intervene in the balance of the allegations and the State of Tennessee declined to intervene altogether.  (Dkt. 61.)  After the United States filed its initial Complaint, the Court dismissed the Relator's non-intervened *qui tam* claims.  (Dkt. 71.)

On November 12, 2024, CPI and PIN (Dkt. 75) and Debbie and Michael Cox (Dkt. 79) each moved to dismiss the initial Complaint.  On March 6, 2025, the Court granted both Motions to Dismiss in full.  (Dkt. 90.)

The United States subsequently moved to amend its initial Complaint (Dkt. 98), which the Court granted (Dkt. 109), and the United States' Amended Complaint was then filed.  (Dkt.  110).

## II.      The United States' Allegations

The Amended Complaint asserts FCA claims against CPI and PIN under 31 U.S.C. § 3729(a)(1)(A) (presentment of false claims) and § 3729(a)(1)(B) (false records or statements material to false claims), as well as common-law claims of payment by mistake and unjust enrichment based on the same underlying conduct.  These are the same claims as in the initial Complaint.

CPI and PIN operated pain management clinics with a primary location in Clarksville, Tennessee, and a second location first in Whitehouse and later in Springfield, Tennessee.   (Am. Compl. ¶¶ 140–42.)  Debbie Cox was the owner of CPI and is an owner of PIN.   (*Id.* ¶¶ 14–17.) Michael Cox is a former medical sales representative.  (*Id.* ¶ 20.)  He is not a clinician (*id.* ¶ 288) and has never been a member of CPI or PIN.  (*Id.* ¶¶ 14–17.)  He was employed by CPI and PIN and worked "in the business side" of those entities.  (*Id.* ¶¶ 138–39.)

CPI and PIN were different entities enrolled separately in government healthcare programs and had different National Provider Identifier numbers.  (*Id.* ¶¶ 46–53, 59.)  They merged in November 2018, with PIN as the surviving entity, but no facts are alleged as to the terms of the

merger or whether PIN acquired CPI's liabilities. (*Id.* ¶ 16.) The Amended Complaint lumps CPI and PIN together as the "Pain Institute." (*Id.* ¶ 23.)

The Amended Complaint alleges the same four "distinct" fraud schemes as the initial Complaint (*see* Court's Mem. at 12):

***(1 & 2) Urine Drug Tests.*** The first two alleged schemes relate to UDTs. As the Amended Complaint acknowledges, UDTs are the preferred method for close monitoring of patients receiving opioid therapy to "confirm that patients are taking, rather than diverting, the drugs that are prescribed to them, and that they are not taking other drugs not prescribed by the treating physician." (Am. Compl. ¶¶ 87, 89.) The Amended Complaint involves two types of UDTs. Presumptive UDTs provide a binary indication of whether certain drugs or drug classes are present in the patient's sample. (*Id.* ¶ 92.) Definitive UDTs, by contrast, identify the specific concentration of particular substances tested and can be "reasonable and necessary to ensure the treating practitioner has complete and accurate information to manage the patient's care." (*Id.* ¶¶ 93, 96.) The Amended Complaint characterizes CPI's and PIN's providers' ordering of definitive UDTs as medically unnecessary and fraudulent and alleges (albeit in conclusory fashion) that these tests were ordered because they generate higher reimbursement. (*See id.*)

The Local Coverage Determination ("LCD"), cited by the United States as non-binding "guidance" in the Amended Complaint, acknowledges that there are limitations to presumptive UDTs, which "may mean that presumptive testing is insufficient for certain clinical needs." (*Id.* ¶ 108.)[1] LCD L35724 explains that UDT frequency should be based on the clinical assessment and

---

[1] LCD L35724, *Urine Drug Testing*, https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdid=35724. The Amended Complaint makes different use of the LCD than the initial Complaint did. Whereas the initial Complaint alleged that a claim violating an LCD is per se medically unnecessary under Medicare rules, the Amended Complaint now alleges that LCDs merely "provide guidance" as to medical necessity. (*Compare* initial Complaint ¶ 108, *with* Amended Complaint ¶ 108.) This change is no accident or oversight, as it follows the United

risk stratification of the patient and that, as a "baseline," presumptive and definitive UDTs may be performed "3 times each in a rolling 90 days" for high risk patients.  *See* LCD n.2.  LCD L35724 further supports "additional definitive UDT beyond" this baseline if "justified by the clinician in the medical situation[]."  *Id.*

Reinforcing the clinical importance of UDTs, Tennessee law independently requires that prescribers of long-term opioids—like CPI's and PIN's providers—"shall consider mandatory urine drug testing."  Tenn. Code Ann. § 53-11-308(g).

***Standing/Blanket Orders for UDTs***.  The Amended Complaint alleges that CPI and PIN each used standing and blanket orders to force providers to order medically unnecessary UDTs.  (*Id.* ¶¶ 110, 111, 202.)  Yet, after four years of under-seal investigatory discovery—encompassing at least review of documents, communications and medical records, and deposition testimony— plus an additional year of investigation after filing the initial Complaint through extra-judicial discovery, the Amended Complaint still fails to allege any actual standing order or blanket order by either CPI or PIN in any patient's chart or otherwise.  To the contrary, the Amended Complaint concedes that the "Pain Institute" had a UDT policy written by the medical director that provided for the frequency of UDTs to be determined by the individual patient's clinical assessment and risk stratification.  (*Id.* ¶¶ 179–84, 237–38.)

---

States' Attorney General's memorandum titled *Reinstating the Prohibition on Improper Guidance Documents*. (Feb. 5, 2025), https://www.justice.gov/ag/media/1388511.  The 2025 memorandum rescinded the Attorney General's 2021 memorandum discussing the "valuable functions" of guidance documents, including that they may set forth agency interpretations of law and that attorneys in enforcement actions can rely on guidance documents, thus reinforcing in 2025 the non-binding and non-precedential nature of such guidance documents.  *See Issuance and Use of Guidance Documents by the Department of Justice* (July 1, 2021), https://www.justice.gov/d9/2022-12/attorney_general_memorandum_- _issuance_and_use_of_guidance_documents_by_the_doj712021.pdf.  Thus, the United States' Amended Complaint now does not allege that CPI or PIN's non-compliance with the LCD is the basis for the alleged fraudulent schemes or the falsity of any alleged claims.

***Reflex Testing for UDTs***.   The Amended Complaint also alleges that "the Pain Institute" (collectively) "had a policy of reflex testing, where patients would be tested for presumptive and definitive UDT without an individualized determination of the clinical appropriateness of the subsequent definitive test on the same date of service every 28 days."  (*Id.* ¶¶ 112, 188.)  Yet, the Amended Complaint does not allege any CPI or PIN policy or directive for any laboratory to perform reflex UDT testing.  In fact, the Amended Complaint alleges that, over a period of more than a decade, fully one-third of CPI's and PIN's patients did *not* receive presumptive and definitive UDTs on the same date.  (*Id.* ¶¶ 316–17.)

**(3) *Allergy Testing.***    The Amended Complaint alleges that CPI's and PIN's providers ordered medically unnecessary allergy tests.  (*Id.* ¶ 273.)  It alleges that "[a]llergy testing has nothing to do with pain management." (*Id.* ¶ 249.)  But, it still pleads ***no*** factual details to support such a medical opinion.

**(4) *Psychological Testing***.   Finally, the Amended Complaint alleges that CPI and PIN submitted fraudulent claims for medically unnecessary psychological tests.  (*Id.* ¶ 298.)  The Amended Complaint alleges that "[t]he tests were medically unnecessary because providers' orders for psychological testing were not specific to the medical needs of each patients and were not based on individualized decision-making at each patient's visit." (*Id.* ¶ 384.)  As with the other schemes, though, the Amended Complaint fails to plead any details showing that all patients received psychological tests or that any particular psychological test for which CPI or PIN submitted a claim was medically unnecessary.

**STANDARD OF REVIEW**

A complaint must be dismissed under Rule 12(b)(6) when it fails to state a claim upon which relief can be granted. *See U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 444 (6th Cir. 2008).  FCA claims must satisfy both Rule 8(a)'s plausibility requirement and Rule 9(b)'s

requirement to plead fraud with particularity. *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 196 n.6 (2016).

Rule 8(a) requires that a complaint contain a short and plain statement showing that the plaintiff is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (cleaned up).

Rule 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this heightened pleading standard, the complaint must allege "the who, what, when, where, and how of the alleged fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (internal quotation marks omitted). Rule 9(b) demands paragraph-by-paragraph scrutiny of the allegations to determine whether FCA claims have been pleaded with the requisite particularity. *See U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 509 (6th Cir. 2007). Rule 9(b) prohibits a plaintiff asserting FCA claims from relying on "group pleading" or on "'blanket references to acts or omissions by all of the defendants.'" *U.S. ex rel. Kramer v. Doyle*, 2022 WL 1186182, at *5 (S.D. Ohio Apr. 21, 2022); *see also Bledsoe*, 501 F.3d at 510.

## ARGUMENT

### I. The Amended Complaint Fails to Plead the FCA Claims.

The FCA claims against CPI and PIN should be dismissed for two reasons. ***First***, the Amended Complaint fails to plead each of the four distinct alleged fraud schemes with particularity against CPI and PIN. ***Second***, the Amended Complaint fails to plead facts sufficient to show that

CPI and PIN *knew* that any alleged claims for medically unnecessary testing were false.

### A. The Amended Complaint Fails to Plead the Details of Each Fraud Scheme with Particularity.

The Amended Complaint fails to state FCA claims against CPI and PIN because it alleges general theories of fraud schemes but fails to plead the particularized details of each scheme as to CPI and PIN and how each entity caused providers to order medically unnecessary UDTs, allergy tests and psychological tests and bill for those tests. *See Sanderson*, 447 F.3d at 877.

#### 1. The Amended Complaint fails to plead the details of any fraud scheme to order and bill for medically unnecessary UDTs resulting from standing or blanket orders.

The Amended Complaint again fails to identify a single standing or blanket order for UDTs—a critical deficiency in the government's theory of fraud that this Court has already identified. (*See* Court's Mem. at 34.) The United States' attempts to fill that fatal gap fare no better this time around. Like the initial Complaint, at most, the Amended Complaint describes "the Pain Institute's" generalized UDT policies requiring *some* drug screening, with frequency to be based on clinical judgment and individual patients' risk stratification. (Am. Compl. ¶¶ 177–82.) But, as the Court previously noted, the base requirement of mandatory UDT not only fails to make out a fraud scheme of causing medically unnecessary UDT, but is also in accord with state law. (*See* Court's Mem. at 34.)

The Amended Complaint expressly acknowledges that providers "refused" to order UDT that they felt patients did not need (Am. Compl. ¶ 195) and that a medical director's guidelines contravened any alleged desires expressed by Michael Cox about UDT (*id.* ¶ 220). For example, when a nurse expressed confusion about how often to perform UDT, Debbie Cox responded that the frequency should be based on the patients' risk stratification and that UDTs "***are at your discretion.***" (*Id.* ¶ 227 at 4/5/2022 6:43 AM message (emphasis supplied) ("If a patient does not

need a drug screen and has been a reliable patient then I would not do a [UDT] unless you find it necessary . . . .").)[2]  The Amended Complaint's own allegations belie its generalized fraud theory that CPI or PIN used standing or blanket orders for UDT in order to defraud government payors.

The Amended Complaint is otherwise rife with impermissible, insufficient and irrelevant allegations regarding the alleged UDT fraud schemes:

***Conclusory Allegations & Implausible Inferences.***  The Amended Complaint ignores this Court's condemnation of its "conclusory, essentially tautological assertions that CPI and PIN billed FHBP for UDT that was not medically necessary or used in the treatment of patients and was 'billed pursuant to impermissible blanket orders and/or not ordered by the treating practitioner.'"  (Court's Mem. at 39.)  Its reliance on hyperbole is no substitute for particularized details to support its grandiose claims.  (*See, e.g.*, Am. Compl. ¶ 300 (asserting that PIN "regularly pushed patients through the clinic like cattle").[3])  Beyond that, the United States has resorted to a few new strategies to try to cross Rule 9(b)'s hurdle, but those attempts fail.

First, the United States asks the Court to infer a fraudulent scheme based on assumptions about patients' understanding and opinions.  (*See, e.g.*, Am. Compl. ¶ 155 ("Patients generally understood…."); *id.* ¶ 302 ("The patient thought he only needed to complete a couple of drug

---

[2] If standing or blanket orders were truly in place—and if the Coxes so militantly enforced them, as the Amended Complaint alleges—it strains credulity that clinic staff would be so unclear about the alleged scheme eight years into its operation, let alone that they would raise this issue directly with Debbie Cox, one of the supposed masterminds and chief intimidators. While the excerpts quoted in preceding paragraphs of the Amended Complaint hope to paint a picture of the Coxes requiring unnecessary testing, consideration of the conversation in full shows that Debbie Cox affirmatively discussed ***not*** testing every patient unnecessarily.  (*Id.* ¶ 227 ("The new lab manager said to do a [UDT] on everyone… That is not happening we are going to follow our risk protocol….").)

[3] Similarly, the added "detail" that a former PIN member was convicted of violating 21 U.S.C. § 846 in an entirely unrelated matter after withdrawing his 1% membership interest has no bearing on this lawsuit.  (Am. Compl. ¶ 15.)  This is a transparent attempt to infer guilt by association so as to bolster deficient fraud claims against CPI and PIN (and the Coxes).

9

screens per year . . . ."); *id.* ¶ 304 ("The amount of UDT galled the patient because the patient felt it was a waste. The patient understood that to continue being a patient at the Pain Institute . . . ."); *id.* ¶ 305 ("The patient felt that a provider at the Pain Institute seemed to try to force the patient into receiving services that the patient did not want or need.").) Patients also allegedly sometimes asked "why they were being tested again if they were just tested the month before," but the Amended Complaint omits any provider response or other facts that might contextualize or tie this question to some sort of fraud scheme. (*Id.* ¶ 176.) Nothing in the Amended Complaint connects any perceptions, beliefs or opinions to any unnecessary UDT or any fraudulent claim. *See U.S. ex rel. Richardson v. Lexington Foot & Ankle Ctr. PSC*, 2018 WL 2709320, at *6 (E.D. Ky. June 5, 2018) ("[W]ithout more [than bare allegations that relator failed to observe defendants' staff taking steps to ensure medical necessity], the allegations concerning treatments every 61-days does not indicate that the defendants submitted fraudulent claims.").

The Amended Complaint takes the same tack regarding the "general belie[fs]" of employees. (*See, e.g.*, *id.* ¶ 198 ("Employees at the Pain Institute generally believed that the clinic was performing a high and concerning level of UDT.").) Where it does attempt to add some level of detail, it would ask the Court to make implausible inferences to connect ambiguous employee remarks to an unidentified standing or blanket order. For example, the Amended Complaint alleges that a nurse said she "believe[d]" they should be doing less UDT than "Michael would like us to do" and baldly asserts that that comment somehow "evidence[s]" a standing or blanket order. (*Id.* ¶¶ 190, 221.) This fraud-by-feelings approach does not provide the particularized details required under Rule 9(b). *See U.S. ex rel. Gale v. Raytheon Co.,* 2009 WL 3378976, at *4 (S.D. Cal. Oct. 19, 2009) ("Gale must show in a well-pleaded complaint facts particular enough to meet the requirements of Rule 9(b). Without specific facts, Gale's second amended complaint amounts to nothing more than unsubstantiated suspicions and allegations."); *In re Keithley Instruments, Inc.*

*Sec. Litig.*, 268 F. Supp. 2d 887, 899 (N.D. Ohio 2002) ("[T]he allegation that unknown employees believe Keithley hired a large number of new employees but did not give them 'proper training' presents disgruntled opinion more than any fact stated with particularity.").

The Amended Complaint also refers to certain patients' and employees' impressions that they did not discuss the results of UDT with their provider, suggesting that somehow evidences a fraud scheme. (*See, e.g.*, Am. Compl. ¶¶ 302, 304, 306.) But lack of discussion does not establish that the UDT results were not considered in the patient's medical record and treatment plan or were otherwise medically unnecessary. Nor does it establish with particularity the existence of a blanket or standing order. Likewise, the United States would have the Court infer that *if* providers continued to prescribe controlled substances for patients who failed a drug screen (though it does not actually allege that happened), it must be because the UDT results "were not used to guide medical decision-making and patient care," (*id.* ¶ 195) but these sorts of unsupported assumptions also do not plead a fraud scheme with the particularity required by Rule 9(b).

In short, the United States continues to rely on generalities, conclusory allegations and implausible inferences instead of pleading particular facts to show how the UDTs at issue were conducted pursuant to standing or blanket orders or were otherwise medically unnecessary. Courts routinely reject similar conclusory allegations, and this Court should do so again, too. *See U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 779 (7th Cir. 2016) ("[T]he complaint does not provide any reasons *why* these treatments actually were unnecessary . . . ."); *U.S. ex rel. Shannon v. BHG Holdings, LLC*, 2025 WL 958226, at *8 (D.D.C. Mar. 31, 2025) (dismissing FCA complaint for failure to plead "why the UDTs at issue were not medically appropriate or necessary" where relator cited only the Medicare statue in asserting that "ordering UDTs without obtaining initial screening" was not medically necessary); *U.S. ex rel. Jensen v. Genesis Lab'y*, 2025 WL 615480, at *13 (D.N.J. Feb. 26, 2025) ("*Genesis I*") (dismissing

complaint where relator failed to allege "that the tests were medically unnecessary based on the nature of the tests," "that the treating providers were tricked or confused into ordering medically unnecessary tests, that providers were encouraged to order a specific testing regime, or that the tests were medically unnecessary based on medical literature or physician opinions."); *U.S. ex rel. Alt v. Anesthesia Servs. Assocs., PLLC*, 2019 WL 7372511, at *9 (M.D. Tenn. Dec. 31, 2019).

***Payor Audits and Education.*** The United States re-hashes the same allegations regarding the single CMS contractor audit document related to PIN's UDTs (Am. Compl. ¶¶ 383–90) and continues to rely on audits by commercial payors (*id.* ¶¶ 367–71, 380, 395, 399, 405). As the Court stated, this reliance is "misplaced, particularly given that none of these audits is alleged to have found improper billing based on standing orders or blanket orders." (Court's Mem. at 40.) The United States has added allegations relating to one provider's "Comparative Billing Report" for 2016 UDT services. (Am. Compl. ¶¶ 356–66.) While this report is alleged to have measured billing of certain codes compared to state and national averages, the Amended Complaint does *not* allege that the report actually says that particular UDTs lacked medical necessity or that any standing or blanket UDT orders existed. (*Id.*; *see also* Court's Mem. at 40.)

***Statistics and Sampling.*** The United States continues to rely on statistics and aggregated data without detailing the particularities of any fraudulent scheme, even though the Court previously held that "a mere 'improbability' that all of the testing for which CPI and PIN billed was medically necessary again does not satisfy the government's obligation to plead with particularity the facts" establishing a fraudulent scheme. (Court's Mem. at 40.)[4] Yet the United

---

[4] *See, e.g.*, *U.S. ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892, 897-98 (5th Cir. 2020) (statistical data insufficient to establish FCA claim when there was "a legal and obvious alternative explanation"); *U.S. ex rel. Senters v. Quest Diagnostics, Inc.*, 2024 WL 4297469, at *5-6 (N.D. Ga. Aug. 23, 2024) (dismissing allegations regarding medically unnecessary lab testing because the relator's "position appears to be that, because of the (alleged) shady nature of the scheme—and the high number of tests completed and amounts billed as Quest

States continues to invoke precisely these types of improbabilities relating to the percentage of visits to PIN that included same-day presumptive and definitive UDTs. (Am. Compl. ¶¶ 315–17.) The Amended Complaint's new allegations consist of more of the same. It suggests that the Court should infer a lack of medical necessity based solely on the quantity of UDT billed at different reimbursement levels, baldly stating that such data "demonstrate[s] direction, coordination, and intent." (*Id.* ¶ 309; *see also id.* ¶¶ 310–20, 333.)

The Amended Complaint's citation to the United States' own analysis of a "random sample" of claims leaves more questions than it answers. (*Id.* ¶¶ 325–37.) The allegations lack key details one would expect the United States should have given its own review, such as how the sample was generated, who analyzed the sample, what criteria were used in reviewing the sample, or why certain results indicate a lack of medical necessity other than the United States' own conclusions. Indeed, the Amended Complaint cites no laws or regulations or even the requirements for any particular billing codes relative to the "sample" against which the purported "results" should be or could be viewed that would allow the Court to plausibly infer that the results are indicative of some sort of fraud. The Amended Complaint then concludes—albeit without factual support or detail—that there "were no orders for definitive UDT until 2023," presumptive tests were not reviewed and that templated physician rationales were "typically" used in progress notes. The Amended Complaint then tells us that these observations showed non-compliance with

began implementing more and more custom panels in doctors' offices — some of the tests must have been unnecessary and that doctors must have ordered unnecessary tests."); *U.S. ex rel. Winnon v. Lozano*, 2023 WL 6065162, at *6 (D.D.C. Sep. 18, 2023) ("[R]eliance on statistical or mathematical probabilities alone does not meet the heightened particularity requirements."); *U.S. ex rel. Johnson v. Bethany Hospice & Palliative Care, LLC*, 2020 WL 1542339, at *11 (S.D. Ga. Mar. 31, 2020), *aff'd sub nom. Est. of Helmly v. Bethany Hospice & Palliative Care of Coastal Georgia, LLC*, 853 F. App'x 496 (11th Cir. 2021) ("By claiming that, based on the number of Medicare referrals from doctors, Bethany Hospice must have submitted a false claim to the government, Relators are asking the Court to assume claims were submitted.").

unspecified "Medicare's requirements."  (*Id.* ¶ 325.)[5]

The Amended Complaint's use of percentages relative to the sample fares no better, as it provides no context or explanation regarding why any percentage should be construed as indicative of fraud.  Rather, it speculates that presumptive UDT results were not considered, "a different and lower UDT code *may have been indicated*," and that there was "a lack of medical records" to support UDT testing.  (*Id.* ¶ 335 (emphasis supplied).)  It omits any details about any particular patient in the sample, any of their risk factors or any clinical circumstances relevant to the ordering of UDTs.  (*Id.* ¶¶ 331, 336.)  As a result, these allegations are more reflective of the United States' opinions and conclusions rather than well-pleaded facts to support claims of fraud.

The Amended Complaint's purported sampling of claims data and the conclusions it draws therefrom (*id.* ¶¶ 341-42) fall short of pleading particularized details of a fraud scheme.  *See U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 2014 WL 4375638, at \*15 (E.D. Pa. Sep. 4, 2014) (dismissing complaint where relator did not allege facts showing that any unmarked pipe fittings in an alleged sample were not made in the United States such that they could underlie a false claim, even "accept[ing] [relator's] assertion that the eBay listings constitute a reasonable

---

[5] Numerous other deficiencies plague the Amended Complaint's "sampling" allegations.  It begins by stating that a "review of a random sample of the Pain Institute's claims paid for by Medicare from 2014 through 2023 indicated that more than [95%] of claims reviewed were not medically necessary or reasonable and, at times, lacked necessary documentation."  (*Id.* ¶ 325.)  This allegation does not even state *what services* the claims were for.  It then asserts that "many UDT claims were not supported," but leaves out any detail as *why* they were medically unnecessary. (*Id.* ¶ 327.)  The allegations fail to explain why certain orders for definitive UDT "were not individualized to the care of the patient" or how often "templated rationale[s] for definitive UDT . . . appeared across progress notes" when they did so "typically" or "consistent[ly]."  (*Id.* ¶ 328–29, 332.)  And in another "sample"—the details of which are not included—the United States not only admits that not *all* the records included both presumptive and definitive UDT claims but also fails to elaborate on any detail about patient records that would suggest lack of medical necessity beyond mere "improbabilities."  (*Id.* ¶ 336; Court's Mem. at 40.)  The United States appears to take issue with the way providers documented their UDT orders, but it does not point to any legal requirement dictating how orders should be documented, nor does it allege the existence of a standing or blanket order (as described above).

representative sample"); *U.S. ex rel. Brooks v. Trillium Cmty. Health Plan, Inc.*, 2017 WL 2805863, at *4 (D. Or. June 28, 2017) (dismissing FCA claims based in part on "random sample analysis" where relator alleged that "expert sampled 11,000 claims" but failed to provide any specific allegations of false claims submitted); *see also Aetna Life Ins. Co. v. Maximum Medical & Rehab., LLC*, 2025 WL 1193782, at *6 (D.N.J. Apr. 23, 2025) (dismissing FCA claims where "Plaintiff ha[d] the information necessary to inject precision into its pleadings, but chose not to").

**CMS Suspension.** The Amended Complaint alleges that CMS suspended Medicare payments to the Pain Institute in May 2024 based on "a credible allegation of fraud." (*Id.* ¶ 343–44); *see* 42 C.F.R. § 405.371(a)(2). Allegations regarding the payment suspension in 2024 are a red herring. To start, the fact that the United States itself concluded there were "credible allegations of fraud" does not establish that the United States' allegations of fraud are credible (or, as relevant at the pleading stage, particularized). Moreover, CMS need not survive Rule 9(b) to suspend payment, and to the extent the suspension was based on allegations in the initial Complaint, this Court held it did *not* plead fraud with particularity. Additionally, although the Amended Complaint recites five example claims cited by CMS, the allegation contains no details about the claims or their medical necessity apart from the same sort of conclusory assertions relied on elsewhere in the Amended Complaint. (Am. Compl. ¶¶ 345–49.) Notably, the Amended Complaint admits that CMS found an "absence of standing orders within the medical records" it reviewed. But, CMS then reaches the self-serving conclusion that the lack of a standing orders in the medical records "does not confirm the lack of standing orders," from which the Amended Complaint then conveniently speculates that this must mean there was a verbal standing order. (*Id.* ¶¶ 350–51.) This is not enough under Rule 9(b).

**Patient Examples.** The United States tacks on commentary to each patient example that it relied on in the initial Complaint, but the new allegations lack the details necessary to show that

the examples of purported false claims arose from or were part of a fraudulent scheme. (*Id.* ¶¶ 408–10.) Moreover, contrary to the United States' bald assertions, the use of the common language for medical necessity in hand-selected patient files does not alone indicate the presence of a standing or blanket order or fraud. (*See id.* ¶ 203.) Even if the Court might agree that the claims were for medically unnecessary services, "the FCA 'does not penalize all factually inaccurate statements, but only those statements made with knowledge of their falsity.'" (Court's Mem. at 46 (quoting *United States v. Houston*, 2011 WL 4899983, at *4 (M.D. Tenn. Oct. 14, 2011)).

> **2.** **The Amended Complaint fails to plead the details of any fraud scheme to order and bill for medically unnecessary UDTs as a result of reflex testing.**

The Amended Complaint continues to travel on the conclusory allegations that PIN "had a policy of reflex testing," while invoking an email from a third-party consultant stating that reflex testing would not occur as support for the existence of a reflex testing scheme. (*Id.* ¶¶ 188, 233.) It also elaborates on its prior allegations that patients were tested every 28 days, but it still does not explain why or how that time frame led to medically unnecessary testing. And, it continues to rely on the statistic that 67% of Medicare patient visits included both presumptive and definitive testing. (*Id.* ¶¶ 315–17, 321–22.) As the Court has already held, however, bare statistics lacking "any details about the existence of a scheme requiring reflexive testing" cannot alone establish "that reflex testing was actually occurring." (Court's Mem. at 41.) The United States' weak attempt to contextualize the consultant's email according to the Court's guidance is simply another example of conclusory pleading: Paragraph 234 includes no facts linking Mr. Heckle (who discussed reflex testing) to the alleged email between Michelle Sandlin and Michael Cox regarding blanket orders, nor does it explain why that email was anything but a description of what blanket orders are and why they are not permitted. (Am. Compl. ¶ 234; *see* Court's Mem. at 42.)

Other new "details" do nothing to remedy the problems that doomed the initial Complaint.

16

For example, allegations regarding review of medical record samples fail to specify any details as to why same-day presumptive and definitive testing was medically unnecessary or showing that it was performed pursuant to an impermissible fraud scheme, especially where the allegations lack any description of the sample or how much same-day testing occurred in relation to the total sample size. (Am. Compl. ¶¶ 334–36.) Thus, this Court's prior holding still applies: the Amended Complaint lacks "detailed allegations showing presumptive and definitive testing was for the same patients or even on the same day, that the tests were performed without a provider's order, or that any of them were medically necessary." (Court's Mem. at 42); *see also U.S. ex rel. McKoy v. Atlanta Primary Care Peachtree, PC*, 2025 WL 1823269, at *6 (11th Cir. July 2, 2025) (affirming dismissal where relator "only alleged a mosaic of circumstances" regarding medically unnecessary tests, but failed to "allege with particularity that these background factors ever converged and produced an actual false claim." (quotations modified)).

### 3. The Amended Complaint fails to plead the details of any fraud scheme to order and bill for medically unnecessary allergy tests.

With respect to the alleged allergy testing scheme, the Amended Complaint continues to rely on allegations that are "wholly conclusory and not supported with reference to actual facts and patient records." (*See* Court's Mem. at 42–43.) To bolster its conclusory allegations, the United States resorts to invoking the same generalized, subjective and unsubstantiated beliefs and impressions of patients and employees, as it does for the UDT schemes. (*E.g.*, Am. Compl. ¶ 251 ("Patients and employees at the Pain Institute alike did not understand why the Pain Institute chose to offer allergy testing."); *id.* ¶ 253 (noting that one medical assistant/office manager referred patients to their nurse practitioner for medical advice regarding allergy testing but that employee believed the allergy testing "'made no freaking sense'"); *id.* ¶ 254 ("Another employee called the allergy testing program 'weird.'"). These allegations are no more persuasive or particularized here

than in connection with the alleged UDT schemes. *See U.S. ex rel. McFarland v. Fla. Pharmacy Sols.*, 358 F. Supp. 3d 1316, 1327 (M.D. Fla. 2017) (refusing to accept "conclusions masquerading as facts," including, for example, unfounded allegations that "a doctor categorically cannot prescribe a scar cream after a telephone consultation").

As with the UDT allegations, the Amended Complaint also attempts to cast normal business activities such as tracking of services, training documents, and lists of employee duties in a sinister light. (*See, e.g.*, *id.* ¶ 259–63 (referring to tracking of data related to allergy testing services and recipients); *id.* ¶ 262 (referring to training documents for medical assistants describing how to offer allergy tests to patients).) Even the allergy testing policy alleged in the Amended Complaint requires an employee to determine whether the patient "ha[s] allergy symptoms" and other specified conditions to assess eligibility for allergy testing, contradicting any argument that it was "pushed" on all patients without medical necessity. (*Id.* ¶ 262, 264; *cf. id.* ¶ 265); *U.S. ex rel. Jensen v. Genesis Lab'y*, 2025 WL 3763951, at *6 (D.N.J. Dec. 30, 2025) ("*Genesis II*") (holding allegations based on requisition form that included language reminding providers to order only medically necessary tests did not show how form led to unnecessary tests, because "Relators again raise only the *possibility* of false claims," which is insufficient).

The Amended Complaint also alleges no basis for inferring that "push[ing]" allergy tests actually resulted in medically unnecessary testing. (*See* Am. Compl. ¶ 262). Encouraging services without connecting them to actual claims for medically unnecessary services is not enough. *See Genesis II*, 2025 WL 3763951, at *5–6 (dismissing amended complaint because new allegation that defendant "stressed" to sales staff the "need to have providers order multiple tests" was insufficient to establish medical unnecessity); *U.S. ex rel. Gordon v. Shiel Med. Lab'y*, 2025 WL 949432, at *17 (E.D.N.Y. Mar. 29, 2025) ("[W]here the complaint alleges that [defendant] was pressuring Gordon 'to make sure he was adding codes,' it does not explain why the codes were

false or whether SNFs or physicians had not reviewed or authorized them based on the patient's condition. Relator expects the court to accept its speculation that the codes must have been false because Relator states so in a conclusory fashion; however, that is not the standard."); *U.S. ex rel. Kietzman v. Bethany Circle of King's Daughters of Madison, Indiana, Inc.*, 305 F. Supp. 3d 964, 984 n.3 (S.D. Ind. 2018) (dismissing FCA claims where the complaint "never even allege[d] an objective standard by which the scans' propriety and necessity was measured").

The Amended Complaint's allegations regarding samples of allergy testing are also insufficient. (*E.g.*, Am. Compl. ¶ 338.) Those descriptions do not show who reviewed the various samples, who or what entity determined the lack of medical necessity, any of the underlying details of any particular medical record, or why certain tests were not "supported." (*See id.*); *McKoy*, 2025 WL 1823269, at *6 (finding allegations insufficient where relator "does not give any details about why these tests were medically unnecessary"); *Genesis I*, 2025 WL 615480, at *13 (dismissing complaint where "Relators have not alleged any additional facts . . . for the Court to infer falsity based on medically unnecessary testing"); *Victaulic*, 2014 WL 4375638, at *15.

Finally, the United States identifies no particular false claim for allergy testing, alleging only the CPT code purportedly used and a general period during which allergy tests were administered. (*See id.* ¶ 255.)

The Amended Complaint attempts to distract from all these deficiencies with added allegations that are completely irrelevant to whether PIN or CPI submitted false claims to the government for payment, such as regarding alleged sterilization and re-use of single-use plastic prongs for allergy tests. (*Id.* ¶¶ 273–78.) These sorts of allegations have no connection to any alleged scheme to conduct medically unnecessary allergy tests.

> **4.** **The Amended Complaint fails to plead the details of any scheme to order and bill for medically unnecessary psychological testing.**

To attempt to plead its psychological testing scheme, the Amended Complaint relies on many of the allegations the Court found deficient in the initial Complaint, including those relating to "pressure" from Michael Cox in reciting state law requirements, provider education and commercial payor audits relating to provider qualification rather than medical necessity, and a schedule describing when to run certain psychological tests. (*See id.* ¶¶ 377, 382, 401, 406; Court's Mem. at 43–44.)

The United States' new "detail" remains "vague and conclusory," and the Amended Complaint still lacks "allegations showing the existence of such an express policy" beyond vague assertions of "pressure." (Court's Mem. at 43); *see Genesis II*, 2025 WL 3763951, at *5–6 (allegation that defendant "stressed" having providers order multiple tests was insufficient to establish lack of medical necessity). For example, the Amended Complaint generally asserts that psychological tests were medically unnecessary because "providers' orders for psychological testing were not specific to the medical needs of patients and were not based on individualized decision-making at each patient's visit" and because "[t]he Coxes structured the Pain Institute's psychological testing program to test every patient they could." (Am. Compl. ¶ 284.) These are the sort of "essentially tautological assertions" this Court found insufficient in the initial Complaint. (Court's Mem. at 39 (regarding UDT).) The Amended Complaint lacks specific details about any particular patient who took a psychological test and why, based on that patient's medical record, the test was medically unnecessary.

Allegations regarding a monthly schedule for psychological tests remain lacking in details that "explain or contextualize the exchange or the calendar" or that "allege that psychological tests were performed according to the schedule, that the provider believed such tests to be medically unnecessary and conducted them anyway, or that any tests were medically unnecessary." (Court's Mem. at 44.) The Amended Complaint tries to rehabilitate its allegations regarding this monthly

scheduling by alleging that in March 2022, PIN billed 24 instances of CPT Code G0396 and zero instances of CPT code 96138 despite billing "hundreds" of those two codes the prior two months. (Am. Compl. ¶¶ 293–96, 323–24.)  This allegation only underscores the implausibility of the government's scheme—it alleges that PIN did bill for psychological testing in March 2022 even though the calendar that allegedly dictated unnecessary psychological testing is blank for March, undermining the inference that providers did not exercise their professional judgment about administering tests outside the calendar's prescription.  (*Id.* ¶¶ 296, 324.)  Moreover, these allegations lack any details contextualizing those CPT codes, particular tests, or particular patients who received them.

New "detail" relating to private audits and education likewise do not indicate lack of medical necessity.  (*Id.* ¶¶ 376, 380–81, 394, 400, 404 (referring to failure to provide "assessment, documentation of time, and intervention"); *id.* ¶ 396 (referring to time spent on testing).)  As with claim denials based on provider qualification, "the auditors are not alleged to have found that testing was medically unnecessary."  (Court's Mem. at 44.)  Similarly, any alleged lack of discussion about the results of a psychological test does not indicate that the test was medically unnecessary.  (*See, e.g.*, *id.* ¶¶ 292, 306.)

Next, allegations related to reviewing samples of medical records are insufficient for the same reasons as in the context of UDT and allergy testing.  *See Victaulic Co.*, 2014 WL 4375638, at *15; *McKoy*, 2025 WL 1823269, at *6.  Those allegations provide no details regarding who conducted the sample testing, who analyzed the data and by what standards, and why certain tests "did not meet the definition of the CPT code billed." (*See id.* ¶¶ 339.)  The Amended Complaint offers no description of how the representative sample was generated or how many claims were reviewed as part of that sample.  (*See, e.g.*, *id.* ¶ 340 (referring to 150 claims out of an unknown number of claims).)  The United States also fails to establish why spending less than 30 minutes

on a psychological test indicates lack of medical necessity.  (*See id.* ¶¶ 340, 410(B)(vii)); *see also Presser*, 836 F.3d at 779; *Kietzman*, 305 F. Supp. 3d at 976; *McFarland*, 358 F. Supp. 3d at 1327.

Finally, grasping at straws for factual allegations, the United States again points to the feelings of former employees and patients as a basis for finding fraud.  (*E.g.*, *id.* ¶ 289 ("[I]t felt to Employee #5 like the tests were ordered for every patient on every visit.  Patients did not like it."); ¶ 290 (referencing patient complaints about psychological tests); ¶ 291 (noting that the patient "felt" certain questions "were repetitive in nature").)  Such attenuated "feelings" cannot be the basis of a fraud claim.  *See Raytheon*, 2009 WL 3378976, at *4; *In re Keithley Instruments, Inc. Sec. Litig.*, 268 F. Supp. 2d at 899.

**B.      The Amended Complaint Fails to Plead CPI and PIN's Acted with the Requisite Intent.**

The Amended Complaint must plead facts sufficient to meet the FCA's "rigorous" scienter requirement, which must be strictly enforced by the Court, as to both CPI and PIN and as to each scheme.  *See Escobar*, 579 U.S. at 192.  It cannot rely on "conclusory assertions" of scienter "without reference to [a] factual context."  *United States v. Walgreen Co.*, 591 F. Supp. 3d 297, 312 (E.D. Tenn. 2022) (internal quotation marks omitted).  Indeed, though FCA scienter may be "demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.  An ample factual basis must be supplied to support the charges." *United States v. Quicken Loans, Inc.*, 2017 WL 930039, at *5 (E.D. Mich. Mar. 9, 2017) (internal quotation marks omitted).  Knowledge can mean actual knowledge, deliberate ignorance or reckless disregard that the claims were false.  *Escobar*, 579 U.S. at 182 (citing 31 U.S.C. § 3729(b)(1)(A)).

Rather than pleading facts to meet this standard, the Amended Complaint again merely alleges that CPI's and PIN's licensed nurse practitioners and physicians ordered the tests at issue

and submitted claims through the entities. (*See* Court's Mem. at 45–46.) The Amended Complaint has not remedied the lack of any allegations establishing "a basis for the entities' knowledge of the purported falsity of individual providers' submissions of claims to Medicare for reimbursement, simply by virtue of the claims' having been submitted through the entities as the billing provider." (*See id.* at 45); *see also Shiel*, 2025 WL 949432, at *19 ("[C]onclusory allegations that Defendants acted knowingly without setting forth any specific facts supporting such allegations" were insufficient to plead scienter). While the government may point to new "details" relating to audits and commercial payors, these cannot provide the basis for finding notice of medically unnecessary testing where such audits and denials do not detail or involve examples of medically unnecessary testing. (Am. Compl. ¶¶ 353–407.)

Beyond that, the Amended Complaint seeks to establish CPI's or PIN's scienter largely through communications involving Debbie Cox and Michael Cox. As discussed above, those communications, however, involve CPI and PIN seeking compliance and billing advice (Am. Compl. ¶¶ 207–11, 233–35), or reference policies requiring patient-by-patient determinations by clinicians in ordering the tests at issue (*id.* ¶¶ 178–79), all of which actually undermine scienter. As this Court previously held, "[t]o the extent the government seeks to establish the entities' knowledge through communications in which Debbie Cox and Michael Cox were involved . . . none of those communications is sufficient to establish that the individual defendants cause the submission of false statements." (Court's Mem. at 46.) For the reasons stated in Debbie Cox's and Michael Cox's motion to dismiss the Amended Complaint and those discussed above, the Amended Complaint fails to allege facts that show Debbie Cox or Michael Cox knew that any claims submitted by CPI or PIN were false.[6] *Shiel*, 2025 WL 949432, at *19 (dismissing amended

---

[6] Because the Amended Complaint fails to sufficiently allege the submission of false claims under 31 U.S.C. § 3729(a)(1)(A), its claims under § 3729(a)(1)(B) also must fail. *See U.S. ex rel. Dennis*

complaint for failure to "plead facts supporting scienter as to each defendant" (citation omitted)).

## II.    The Common Law Claims Should Be Dismissed.

Because the Amended Complaint's FCA claims fail to state a claim upon which may be granted, the Court must also dismiss the federal common-law claims of payment by mistake and unjust enrichment. *See Alt*, 2019 WL 7372511, at *10 (applying heightened pleading standard to claims "premised upon the same set of facts as the FCA and fraud claims"); *U.S. ex rel. Lawson v. Aegis Therapies, Inc.*, 2015 WL 1541491, at *14 (S.D. Ga. Mar. 31, 2015) (granting summary judgment to defendants for claims of unjust enrichment and payment by mistake that were "purely derivative of the FCA claims"). In connection with its initial Complaint, the United States conceded that "there is no real dispute that those claims would rise and fall with the sufficiency of the Complaint on the FCA theories." (Dkt. 81 at 24.)  "Given this concession," the Court dismissed the common-law claims.  (Court's Mem. at 47.)  The United States makes no effort to otherwise bolster or adequately plead the common-law claims on its second try.  The Amended Complaint's claims of payment by mistake and unjust enrichment should again be dismissed.

## III.    The Amended Complaint Should Be Dismissed with Prejudice.

The Court should dismiss the Amended Complaint with prejudice.  A plaintiff in the Sixth Circuit is typically afforded "at least one chance to amend the complaint" before the action is dismissed with prejudice. *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003).  The United States has had that chance.  The Court previously outlined the numerous deficiencies in the initial Complaint, and the Amended Complaint's new allegations fare no better

---

*v. Health Mgmt. Assocs., Inc.*, 2013 WL 146048, at *17 (M.D. Tenn. Jan. 14, 2013).  The § 3729(a)(1)(B) claim also fails because the United States has not alleged with particularity what allegedly false records or statements that claim is based on or how any such false records or statements are material to any allegedly false claims—despite the Court noting these deficiencies in the initial Complaint.  (Court's Mem. at 45.)

at pleading any of the four fraud schemes as against CPI or PIN or pleading that either entity knew providers submitted claims for allegedly medically unnecessary tests.

Although leave to amend should be freely granted "when justice so requires," Fed. R. Civ. P. 15(a)(2), at this stage, where the Court has already resolved the merits of a Rule 12(b)(6) motion to dismiss once following years of government investigation, "it is a stretch to say justice requires granting leave to cure the complaint's deficiencies." *U.S. ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 918 n.2 (6th Cir. 2017) (citation omitted). A third bite at the apple should accordingly be denied as futile and prejudicial to Defendants. *See U.S. ex rel. Sharma v. Miraca Life Scis., Inc.*, 472 F. Supp. 3d 429, 449 (N.D. Ohio 2020) (denying leave where relator already amended in response to defendants' Rule 9(b) arguments and offered "no meaningful argument why he should be provided yet another opportunity to amend, nearly four years after this case was filed."); *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28–29 (2d Cir. 2016) (affirming denial of leave to amend where relator was "fully aware of the Rule 9(b) challenges to his pleading" and still "failed to cure the Rule 9(b) deficiencies"); *Leading Edge Distrib., Ltd. v. All-State Diversified Prods., Inc.*, 2012 WL 13026944, at *2 (N.D. Ohio May 15, 2012) (denying amendment because "it would prejudice Defendants to incur the cost and expense of filing a third round of dispositive motions."). The Court should exercise its discretion to dismiss the Amended Complaint with prejudice.

<u>**CONCLUSION**</u>

For these reasons, and because the United States has now had multiple failed opportunities to plead its case following five years of investigation, CPI and PIN respectfully request that the Court dismiss the Amended Complaint with prejudice.

Dated this 23rd day of April 2026.

Respectfully submitted,

BASS, BERRY & SIMS PLC

/s/ Matthew M. Curley
Matthew M. Curley (TN Bar No. 018163)
Brian F. Irving (TN Bar No. 033945)
Hannah E. Webber (TN Bar No. 036244)
21 Platform Way South, Suite 3500
Nashville, TN 37203
(615) 742-6200
mcurley@bassberry.com
birving@bassberry.com
hannah.webber@bassberry.com

*Attorneys for Defendants Clarksville Pain
Institute, LLC, and Pain Institute of
Nashville, PLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2026, the foregoing document was electronically filed using the Court's Electronic Filing System, which will send a Notice of Electronic Filing to the following:

Wynn Shuford
U.S. ATTORNEY'S OFFICE
MIDDLE DISTRICT OF TENNESSEE
719 Church Street, Suite 3300
Nashville, TN 37203

Taylor M. Davidson
Phillip H. Bangle
TENNESSEE ATTORNEY
GENERAL'S OFFICE
500 MLK Jr., Blvd.
Nashville, TN 37243

Jerry E. Martin
Seth M. Hyatt
BARRETT JOHNSTON MARTIN
& GARRISON, PLLC
200 31st Avenue North
Nashville, TN 37203

David K. Colapinto
KOHN, KOHN & COLAPINTO, LLP
1710 N Street NW
Washington, DC 20036

Susan M. Coler
HALUNEN LAW PLLC
80 South Eighth Street Suite 1650
Minneapolis, MN 55402

/s/ Matthew M. Curley
Matthew M. Curley